IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 4, 2011 Session

## GENEIL HAILEY DILLEHAY v. VELMER JEAN GIBBS

**Direct Appeal from the Chancery Court for Smith County**
**No. 7352     Charles K. Smith, Chancellor**

**No. M2010-01750-COA-R3-CV - Filed June 16, 2011**

In this boundary line dispute, Plaintiff-Appellant argues that the trial court erred by relying on the survey of Defendant-Appellee's expert and not on the surveys proffered by Plaintiff-Appellant's experts in determining the boundary. After a thorough review of the record, we conclude that the evidence does not preponderate against the trial court's decision. Consequently, we affirm.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Chancery Court Affirmed**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and HOLLY M. KIRBY, J., joined.

John D. Kitch, Nashville, Tennessee, for the appellant, Geneil Hailey Dillehay.

Jacky O. Bellar and Jamie D. Winkler, Carthage, Tennessee, for the appellee, Velmer Jean Gibbs.

### OPINION

This is a boundary line dispute between the owners of two farms in the hollows of Smith County. Plaintiff-Appellant, Mrs. Geneil Hailey Dillehay, filed her complaint in the chancery court on January 20, 2007, seeking to establish the boundary line between the two farms.[1] In addition to declaratory relief, Mrs. Dillehay also requested a temporary restraining order enjoining Defendant-Appellee, Ms. Velmer Jean Gibbs, from trespassing upon the disputed land or altering its physical characteristics.

---

[1]Mrs. Dillehay's complaint was submitted by attorney Tecia Puckett Pryor. On May 15, 2007, attorney Gary Vandever was substituted as counsel, and he served as her attorney at trial. Mrs. Dillehay's attorney on appeal is John D. Kitch.

On February 23, 2007, Ms. Gibbs filed her answer. She asserted that her farm had been in her family for many years with no dispute as to the boundary line. Ms. Gibbs averred that she had a valid recorded survey depicting the true property lines in her favor. She also claimed ownership of the disputed area by virtue of adverse possession.

A hearing on Mrs. Dillehay's request for a temporary injunction was held on February 6, 2007. By order entered June 8, 2007, *nunc pro tunc*, the trial court enjoined both parties from "altering, removing, or damaging the physical and natural evidence and timber located in the disputed area between the parties' farms." The court permitted the parties to flag or stake the disputed area to the extent such markings did not otherwise violate the injunction.

A bench trial was held on June 8, 9, and 10, 2010. Both parties introduced the deeds in their respective chains of title, the testimony of expert land surveyors, the testimony of persons familiar with the properties, and their own testimony. The disputed area lies on the western boundary of Ms. Gibbs's farm and the eastern boundary of Mrs. Dillehay's. It encompasses approximately thirty acres, more or less.

Ms. Gibbs purchased her farm in 1993, and her deed conveys 159 acres. Tax records admitted into evidence show that, from at least 2003-2005, Ms. Gibbs was assessed property taxes on 127 acres. However, in 2006, the year after Mrs. Dillehay purchased her farm, Ms. Gibbs was assessed taxes on 182.4 acres. Ms. Gibbs introduced the deeds in her chain of title dating back to 1920. When she purchased the property, Ms. Gibbs was returning to her "old home place" as her family had previously owned the farm from 1941 until 1954.[2] Ms. Gibbs was born in 1943 and lived and worked with her family on the farm until they moved when she was eleven years old. Ms. Gibbs, as well as four of her siblings, testified that, during the time they lived and worked on the farm, a two-strand barbed-wire fence marked the farm's western boundary line.

Mrs. Dillehay purchased her farm in December of 2005, from the cousin of her husband, Mr. Stanley Dillehay.[3] She described the seller as an absentee landowner. Her deed conveyed two tracts; tract one contained sixty-five acres and tract two contained sixty-nine acres. Mrs. Dillehay testified that she and Mr. Dillehay rode four-wheelers on the farm when they were dating in the late seventies or early eighties, but that she was otherwise unfamiliar with the property. Prior to closing on the purchase of the farm, sometime in late

---

[2]Ms. Gibbs's father, Henry Sircy, purchased the farm in four tracts. He purchased the first tract of 75 acres in 1941; the second tract of 68 acres in 1944; the third tract of 10 acres in 1946; and the fourth tract of 6 acres in 1952. Mr. Sircy then sold the farm, with a total of 159 acres, in 1954.

[3]Mr. Stanley Dillehay is not an owner of any disputed property and is not a party to this suit.

November or early December of 2005, Mr. and Mrs. Dillehay were touring the property when they happened upon Ms. Gibbs working in her barn. The barn is located on the western portion of Ms. Gibbs's farm, near the now disputed area. The three chatted awhile and eventually the Dillehays asked Ms. Gibbs where the boundary line was located. Ms. Gibbs indicated that the boundary line was a "fence down in the hollow" west of the barn. Mrs. Dillehay testified that Ms. Gibbs described the boundary fence as a woven-wire fence; Ms. Gibbs maintains that it is a barbed-wire fence. Because the disputed area is littered with remnants of old fences, the location of the correct fence line later became the subject of great contention and paramount importance.

After this conversation, and without further inquiry into the whereabouts of the boundary line, Mrs. Dillehay purchased her farm. Afterward, the Dillehays again inquired with Ms. Gibbs as to the correct boundary line. On one occasion, Ms. Gibbs and one of her brothers walked the disputed area with the Dillehays. The Dillehays testified that, when walking the approximate boundary line, they located certain monuments called for in old deeds in Mrs. Dillehay's chain of title. For instance, they found remnants of a fence, an old stump, and an old beech tree marked with an "X." Mrs. Dillehay testified that she asked Ms. Gibbs whether this tree marked the boundary line and Ms. Gibbs answered that it did not. Ms. Gibbs maintained that the boundary line was "a fence down in the hollow" west of this location and that these monuments were located on her property.

Eventually, the parties discovered that they disagreed as to the correct boundary line. Both parties hired licensed land surveyors to establish the boundary line. Mrs. Dillehay hired Mike Holland and Richard Puckett; Ms. Gibbs hired Carroll Carman. All three testified at trial.

Both Ms. Gibbs's and Mrs. Dillehay's deeds are boundary deeds. As described at trial, a boundary deed essentially depicts a given property as being bounded on each side by its adjoining landowners.[4] However, the deeds do not give calls and distances necessary to

---

[4]Ms. Gibbs's deed describes her property as being "[b]ounded on the North by Lester Jenkins and Bennie Sutton; East by Raymon West; South by Raymon West and Robert Russell and West by Leslie Oldham and Walter Petty containing One Hundred Fifty-Nine (159) Acres, more or less."

Mrs. Dillehay's deed describes her property as being bounded as follows:

> Tract No. 1: North by the lands of Walter Petty; South by the land of Henry Hall Brown and the lands of Henry Brooks; East by the home place of Genie Sircy; and West by the lands of Walter Petty, containing sixty-five (65) acres, more or less.

(continued...)

place the exact location of the boundary line between the two properties. Consequently, the three surveyors resorted to other, varied means to locate the boundary line. Each surveyor suggested a different line established from different methods with differing degrees of certainty. Generally, Mr. Holland's and Mr. Puckett's lines follow a woven-wire fence and the monuments found by the Dillehays, and are set further east than Mr. Carman's. Mr. Carman's line is set well to the west and is shot on the remnants of a barbed-wire fence.

Mr. Holland testified that, after being contacted by Mrs. Dillehay, he researched the land records at the courthouse, collected data in the field, and spoke with both parties. Mr. Holland described the inherent difficulties in establishing a boundary line from boundary deeds. He stated that he was able to establish the boundary lines for all of Mrs. Dillehay's property, except the disputed boundary line between Mrs. Dillehay's and Ms. Gibbs's farms. Mr. Holland stated that he did not feel comfortable establishing the boundary line at that time. Thus, he did not perform a mathematically closed survey of Mrs. Dillehay's farm.

However, at trial, Mr. Holland did present a line representing the calls and distances extrapolated from old deeds in Mrs. Dillehay's chain of title, i.e., the "Boze deeds," dated 1919, and the "Richardson deed," dated 1920. These deeds contained calls and distances from monuments that Mr. Holland maintained could be plotted.[5] Mr. Holland surmised that,

---

[4](...continued)
> Tract No. 2: Bounded on the East by Lum Russell, Raymond West, and Arville West; North by Walter Petty; South by Henry F. Brown; and West by Robert Russell, containing 69 acres, more or less.

[5]Mrs. Dillehay introduced the handwritten Boze and Richardson deeds into evidence at trial. In her appellate brief, Mrs. Dillehay attached as appendices transcribed versions of the legal descriptions contained in the deed. Without making any finding as to the veracity of her transcription, we have reproduced Mrs. Dillehay's appendices below:

First Tract [Boze]

Beginning on a chestnut on top of [the] ridge Smith and Climer corner. Thence north 120 poles to a beach [sic]. Thence East 56 poles to a stake. Thence South 56 poles to a stake on the east side of the branch. Thence East 36 poles to an oak stump. Thence South 57 poles to a Sourwood – East 26 poles to a stake. Thence South 45 poles to a Beech on the south side of the branch in the head of the Hollow. Thence down the hollow with its meanderings. West 39 poles to a rock on the west side of the branch. Thence north 5° west 6 poles near a rock spring. Thence north 78° west 26 poles to a sugar tree. Thence with the right hand brink of the hill with a marked line northwardly, in all 130 poles to a stake. Thence north 82° west 5 poles to a stake. Thence south 37 1/4° west, 11 poles to the beginning containing by actual survey. 119
(continued...)

-4-

while Mrs. Dillehay's boundary deed omitted such calls and distances, the Boze and Richardson deeds reflected the boundary line as it was understood at the time of their making. Mr. Holland provided a trial exhibit showing the Boze deed line, which generally extends north-south along the woven-wire fence and monuments that the Dillehays found in the disputed area. However, there was some dispute at trial as to whether the monuments the Dillehays located were the same as called for in the Boze and Richardson deeds, given those deeds' ancient origins. Moreover, Mr. Holland never shot the line from the ground and, instead, only drew it on a map.

Because Mr. Holland's line was taken from the calls and distances in the Boze and Richardson deeds and set to match certain monuments, but never shot on the ground, it only travels in cardinal directions and does not necessarily follow the contours of the land. Moreover, while Mr. Holland stated that his exhibit at trial represented the Boze deed line to a reasonable degree of surveying certainty, he refused to call it the boundary line. He explained that he did not know where the boundary line was and that he would "not force a line."

---

[5](...continued)
acres, 3 rods x 34 poles.

### Second Tract [Boze]

Beginning on a maple on the point of a hill, on the said Yeamans east boundary line or in other words, the east boundary line of the above described tract of 119 acres, 3 rods 34 poles. Thence, south with said line 79 poles to a beech near a spring a corner of the above tract. Thence south 83° east, 22 3/4 poles to a poplar. Thence with a marked line around on the brink of the hill in a northward direction in all at the 90 poles to the beginning containing by estimation or actual survey, 10 acres, 3 poles. Both tracts together contain [by the same] 131 acres, more or less.

### [Richardson Deed]

Beginning in the survey in the Boze line in the bottom of the hollow and trees as follows: S. 89 E. 8.60 up the hollow with the branch, S. 73-1/2E. 7P. with the hollow up the branch; S. 67-1/2 E. 16 P. with the hollow up the branch; S. 65 E. 12 P. with the hollow up the branch; N. 74E 4.60 P. passing a structure at 1.2 poles to an elm; S. 2-1/4 E. 4.84 P. to a walnut; S. 45-1/4 W. 4.64 P. to a Sycamore; S. 43-3/4E. 10.24 P. to a stake; S. 55-1/4 E. 41.36 P. to a sugartree near the road S. 85-1/4 E. 20.48 P. to a stake 30 links of two black gum pointers; S. 20-1/2 E. 20.20 P. to a chestnut; S. 18-3/4 E. 20.60 P. to a small hickory bush in or near the Kittrell line with locust, redbud and sugartree pointers. This deed of conveyance is subject to life estate of my mother, Mandy Frances Jenkins, and contains by estimation seventy five acres, be the same more or less.

After Mr. Holland would not definitively establish a boundary line, Mrs. Dillehay hired Mr. Puckett to survey the boundary line. However, it does not appear from the record that Mr. Puckett established a line either. He testified that he was hired to prepare a survey showing where previous owners and surveyors had placed the boundary line. Mr. Puckett stated that, essentially, he had prepared a court exhibit illustrating the various lines as drawn by Mr. Carman and Mr. Holland. As monuments, Mr. Puckett's suggested line used the woven wire fence, the "X" marked beech, and an iron pin set at a fence corner. His line generally followed Mr. Holland's line, except that it was contoured to the shape of the land and extended slightly east of Mr. Holland's line. Consequently, Mr. Puckett's line was well to the east of Mr. Carman's line and drew the boundary most in Mrs. Dillehay's favor. Although he was aware that Mr. Carman also based his line on an old fence, Mr. Puckett testified that he had not walked Mr. Carman's line. Mr. Puckett further indicated that, because the two properties only had boundary deeds, mathematical closure of the boundaries was not possible and that he did not, in fact, know where the boundary line was. He explained that, "if you're going to survey a complete farm, you've got to have where it's been surveyed before . . . where you can check where the pins were, corners were, and . . . those old deeds just didn't have enough to do that."

The third land surveyor to testify was Mr. Carman. A licensed surveyor since 1977, Mr. Carman was hired by Ms. Gibbs, and his survey showed the furthest western extension of her boundary line. He testified that his survey accurately reflected the boundary line between Ms. Gibbs and Mrs. Dillehay to a reasonable degree of surveying certainty. Mr. Carman discussed his methodology in great detail. After researching the deeds and interviewing adjoining landowners and other knowledgeable persons, he attempted to plot the boundary line from the ground. He described the disputed area as being challenging terrain in which to work. After finding the woven-wire fence on which the Holland and Puckett lines were shot, Mr. Carman spoke with Ms. Gibbs's brothers and sisters, who told him that the boundary line was past that point "down yonder." While conceding that this information was not particularly helpful, Mr. Carman went searching for the boundary line so described. While searching, he found many fence remnants, which he surmised had been used for containment of farm animals due to their somewhat arbitrary locations.

Mr. Carman testified that eventually, after using a metal detector, he stumbled upon the remnants of a barbed-wire fence. According to Mr. Carman, the terrain on which the barbed-wire fence was located was "very hilly"; "very tough and rough"; "heavily wooded"; and at a steep incline. Mr. Carman said that, in his expert opinion, a containment fence would not be placed in such difficult terrain and that the location of the fence "indicate[d] that a lot of effort at one day was put into placing the fence to mark between two farms." Mr. Carman explained:

It took a tremendous amount of labor. I have fenced before and in situations like this, and it took a tremendous amount of labor to bring wire in and put posts in and nail to trees and to do all that was done along that boundary line in years gone by. And since we had no evidence in Ms. Gibbs'[s] deed or the now Dillehay deed, I deemed that the decision to run with this fence that was there was the only option that I had as a land surveyor at the time.

On cross-examination, Mr. Carman admitted that the deeds from which he established his line were boundary deeds without reference to monuments or calls and distances. He stated that he did not know who installed the fence upon which he shot his line or their purpose in installing the fence. While he attested to the barbed-wire fence as being the boundary line within a reasonable degree of surveying certainty, Mr. Carman admitted that he could not confirm the line to an absolute certainty. Mr. Carman further admitted that he did not use the Boze deeds in completing his survey. When presented with the Boze deeds at an earlier deposition, Mr. Carman stated that they could have had an impact on his survey. However, by the time he saw the Boze deeds, Mr. Carman testified that he had already completed his survey and been paid. He did not resurvey the line after learning of their existence, explaining that:

Not until two years after [my] rendered survey and the conclusion of the work that had been done and at the end of the deposition [the Boze deed] was handed to me.[6] If it had been handed to me before and we had looked at this, there would have been a potential, a possibility that it would have changed some things at least in discussions. However, the larger view here is that there is a fence that shows continuity from south all the way to the north along the Dillehay line.

When asked whether he had seen or heard anything at trial that would change his opinion as to the veracity of his survey, Mr. Carman replied that, "I still stand by my survey" and further stated that "[t]he Boze survey, in my mind, is very – how shall I say – not credible, because practically every bearing on that deed is either a generalization of east, west, north or south and the property has never been utilized, nor possessed."

Mr. Carman was asked to explain why Ms. Gibbs's acreage, as measured by her property tax assessment, would increase from 127 acres to 182.4 acres in the year after Mrs.

---

[6]The attorneys and witnesses generally referred to the Boze deeds in the singular.

Dillehay purchased her farm. He stated that:

> Boundary deeds in this part of the country are notoriously twenty, thirty, forty percent high or low. We use the term more or less, and in those days it was true, an emphasis on more or less. And it's been . . . not uncommon in my thirty-five years of land surveying to see twenty and thirty percent moves on bounded deeds. And so I was not surprised in the least.

The trial court also heard lay testimony regarding the boundary line. A former owner in Mrs. Dillehay's chain of title, Robert Russell, testified that the boundary was east of Mr. Carman's line. Mr. Russell owned roughly the western portion of Mrs. Dillehay's farm from 1968 until 1977, while Mr. Russell's father owned roughly the eastern portion now in controversy. Mr. Russell testified that he and his father grew tobacco and raised cattle on the properties and that they ran a two-strand barbed-wire fence to contain cattle. Mr. Russell was unclear as to where the exact boundary line was located; however, he maintained that, during the time he lived on the farm, the boundary line was east of Mr. Carman's line.

Ms. Gibbs's siblings, each of whom lived on the farm in their youth, testified regarding the boundary line as understood at that time. Ms. Gibbs's sister, Maime Kitrrell, age 80, lived on the farm from 1941 until her marriage in 1947. She averred that the barbed-wire fence, as reflected by Mr. Carman's survey, served as the boundary line during the time she lived on the farm. Ms. Gibbs's brother, Herbert Sircy, age 60, presently owns the western adjoining farm to Mrs. Dillehay's. He stated that he had cut timber on Ms. Gibbs's farm twice in his life for previous owners. According to Mr. Herbert Sircy, both times he timbered to the barbed-wire fence depicted in the Carman survey because it was the recognized boundary. Ms. Gibbs's brother, John Sircy, age 71, testified that he lived on the farm ten years in his youth and was fifteen when his father sold the farm. He indicated that, for as long as he could remember, the fence, as depicted by Mr. Carman's survey, was in existence and served as the boundary line between the two farms. Ms. Gibbs's brother, Ray Sircy, age 73, lived on the farm for thirteen years and was approximately twenty when his father sold the farm. He testified that when he worked on the farm, a net-wire fence was used to contain hogs. He indicated that the boundary fence was part net-wire and part barbed-wire and that remnants of it still existed.

At the conclusion of the trial, the trial court issued its findings of fact and conclusions of law from the bench. After summarizing the evidence adduced, the trial court found: (1) that Mr. Carman's survey established the boundary line between the two farms; (2) that Ms. Gibbs had adversely possessed the disputed area; and (3) that Mrs. Dillehay's predecessors in title had acquiesced in the boundary line as set by the barbed-wire fence. The trial court

dismissed Mrs. Dillehay's complaint and assessed costs against her. The trial court adopted these oral findings by final judgment entered July 1, 2010.

Mrs. Dillehay timely appealed and raises the following issues for our review, as restated from her brief.

> 1. Whether the trial court erred by accepting Mr. Carman's survey to establish the boundary line?
>
> 2. Whether the trial court erred by determining that Ms. Gibbs adversely possessed the disputed property?
>
> 3. Whether the trial court erred by determining that Mrs. Dillehay acquiesced in the location of the boundary line?

The usual standard of review applicable to bench trials applies in boundary disputes. *Jackson v. Bownas*, No. E2004-01893-COA-R3-CV, 2005 WL 1457752, at *6 (Tenn. Ct. App. June 21, 2005). This Court conducts a *de novo* review of the trial court's decision with a presumption of correctness as to the trial court's findings of fact, unless the evidence preponderates against those findings. *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999).

"In resolving a boundary line dispute, it is the role of the trier of fact to evaluate all the evidence and assess the credibility of the witnesses." *Mix v. Miller*, 27 S.W.3d 508, 514 (Tenn. Ct. App. 1999) (citing *Norman v. Hoyt*, 667 S.W.2d 88, 91 (Tenn. Ct. App. 1983)). "Where there is a conflict in testimony, the trial court is in a better position than this Court to observe the demeanor of the witnesses and evaluate their credibility." *Jackson*, 2005 WL 1457752, at *6. Thus, we will give great weight to a trial court's determinations as to the credibility of witnesses. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997). This deferential standard specifically applies in a boundary dispute where a trial court must choose between two competing surveys. *Jackson*, 2005 WL 1457752, at *6 (citing *Mix*, 27 S.W.3d at 514; *Stovall v. Bagsby*, No. M2002-01901-COA-R3-CV, 2003 WL 22768677, at *2 (Tenn. Ct. App. Nov. 24, 2003); *Edwards v. Heckmann*, No. E2002-02292-COA-R3-CV, 2003 WL 21486987, at *4-5 (Tenn. Ct. App. June 25, 2003)).

"When determining a boundary line that is in dispute, the court must look first to the natural objects or landmarks on the property, then to the artificial objects or landmarks on

the property, then to the boundary lines of adjacent pieces of property, and finally to courses and distances contained in documents relevant to the disputed property." *Mix*, 27 S.W.3d at 513 (citing *Franks v. Burks*, 688 S.W.2d 435, 438 (Tenn. Ct. App. 1984); *Thornburg v. Chase*, 606 S.W.2d 672, 675 (Tenn. Ct. App. 1980)).

After reviewing the record, the appropriate standards of review, and the rules governing boundary disputes, we conclude that the evidence does not preponderate against the trial court's finding that Mr. Carman's survey establishes the boundary line between the parties' farms.

The evidence on either side was problematic and not particularly compelling.[7] All three surveyors were reluctant to establish an exact boundary line and noted the inherent difficulties in doing so based on boundary deeds. Mr. Holland used the old Boze and Richardson deeds to draw a line. However, Mr. Holland refused to call his line the boundary line. Moreover, he never shot his line from the ground, and his straight, compass-point lines do not appear to match the contours of the properties. Mr. Puckett, although his line more closely followed the natural contours of the land, testified that he did not survey the line himself but rather prepared a trial exhibit showing where everyone else had purported the line to be. Mr. Carman's line appears to be based largely on the location of the barbed-wire fence.

Mrs. Dillehay contends that the trial court erred by accepting Mr. Carman's survey, which relies upon an artificial object, i.e., the barbed-wire fence, over Mr. Holland's survey, which relies upon natural objects, i.e., the beech tree and old stump. *See Mix v. Miller*, 27 S.W.3d 508, 513 (Tenn. Ct. App. 1999). We are not persuaded for several reasons. First, we reiterate that Mr. Holland did not purport to establish a boundary line and, in fact, expressly refused to do so. Second, the Boze and Richardson deeds, upon which Mr. Holland's survey relied, were dated 1919 and 1920, and we need not unduly stress the difficulty of matching present trees and stumps to such ancient descriptions. Third, to the extent the Boze and Richardson deeds relied on boundary lines of adjacent properties and courses and distances, these markers are inferior to artificial ones. *See Mix*, 27 S.W.3d at 513. Finally, Mr. Holland's replication of the Boze line relied on a woven-wire fence, itself an artificial marker, at least as much as the natural markers called for in the Boze and

_____

[7]We note that our review was hampered by the appellate record. In addition to referring to trial exhibits which were omitted from the appellate record, the witnesses and attorneys would often refer and point to locations on surveys or maps without sufficient description for a reviewing court to identify the precise location under discussion.

Richardson deeds.

This case essentially boils down to which of two flawed surveys the trial court most credited – Mr. Holland's, cobbled together from ancient deeds with little apparent connection to the land and a disclaimer as to its veracity, or Mr. Carman's, shot from the ground on an old fence with slight support from the underlying deeds. It appears from the record that Mr. Carman was the only surveyor to establish a boundary line within a reasonable degree of surveying certainty. He provided detailed reasons supporting his decision and extensive critiques of the other surveyors' methods. In his expert opinion, Mr. Carman believed that the location of the barbed-wire fence on a steep, wooded slope indicated that it was placed there to serve as a boundary line. He testified that the other fences in the disputed area, including the woven-wire fence upon which the Holland and Puckett lines relied, were in locations indicating their service as containment fences for farm animals.

This conclusion was corroborated by the testimony of Ms. Gibbs and her siblings. They each testified that the barbed-wire fence served as the boundary line when they lived on the farm from 1943 until 1954, and that the woven-wire fence was used for containment purposes. Further, Ms. Gibbs's farm was cut twice for timber, and testimony indicated that both times it was timbered to the barbed-wire fence. While Mr. Russell testified that he and his father constructed a two-strand barbed-wire containment fence, we cannot discern from the record the location of this fence. *See* note 6. The trial court, having seen and heard the witness, determined that the fence Mr. Russell referred to was not located in the disputed area. Moreover, Mr. Russell could not conclusively establish where the boundary line was located during the time he lived and worked on the farm.

From our review of the record, the trial court was intensely engaged in trying this matter. It thoroughly questioned the surveyors' methods and conclusions. It ultimately concluded that Mr. Carman's survey was the most reliable and established the boundary line accordingly. We will give great deference to a trial court's decision between competing surveys. *See, e.g., **Jackson v. Bownas***, No. E2004-01893-COA-R3-CV, 2005 WL 1457752, at *7 (Tenn. Ct. App. June 21, 2005) (citing ***Mix***, 27 S.W.3d at 514; ***Stovall v. Bagsby***, No. M2002-01901-COA-R3-CV, 2003 WL 22768677, at *2 (Tenn. Ct. App. Nov. 24, 2003); ***Edwards v. Heckman***, No. E2002-02292-COA-R3-CV, 2003 WL 21486987, at *4-5 (Tenn. Ct. App. June 25, 2003)). Based on our review, we cannot say that the trial court's findings of fact preponderate against the record. Rather, ample evidence in the record supports the trial court's finding that the barbed-wire fence was historically considered the boundary between the two farms. *See, e.g., **Jackson***, 2005 WL 1457752, at *6 ; ***Collins v. Collins***, No. 03A01-9708-CH-00326, 1998 WL 227778, at *2 (Tenn. Ct. App. May 8, 1998).

Because we have determined that the trial court did not err in establishing the

boundary line in accordance with Mr. Carman's survey, it is not necessary to address whether Ms. Gibbs acquired title to the disputed area by virtue of adverse possession or acquiescence. Consequently, these issues are pretermitted.

For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed against the Appellant, Mrs. Geneil Hailey Dillehay, and her surety.

_____

_____
J. STEVEN STAFFORD, JUDGE