Jack WOOD et ux Vickie E. Wood

v.

Dan G. STARKO, et ux Laurie
D. Starko, et al.

Court of Appeals of Tennessee,
at Nashville.

Jan. 13, 2006 Session.

April 12, 2006.

James A. DeLanis, Nashville, Tennessee, for the appellants, Dan G. Starko and Laurie D. Starko.

Wayne Detring, Hendersonville, Tennessee, for the appellees, Jack Wood and Vickie E. Wood.

## OPINION

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

This action seeks a declaration placing the boundary between two adjacent properties and a claim for damages by one landowner against the other. The trial court placed the boundary line based on pins marking the Corps of Engineers' line, an adjacent landowner, and denied the award of damages. We reverse the judgment of the trial court.

This case concerns a boundary dispute between two adjoining landowners in the Winston Place subdivision on Old Hickory Lake in Sumner County, Tennessee. The subdivision was developed in 1973 and the subdivision plat was recorded the same year. At that time, James Jackson owned the two adjoining lots, 4 and 5, which are at issue in this case. In 1990, Mr. Jackson retained Wayne Diel to survey both properties and based upon that survey, Mr. Jackson built a concrete sidewalk along what he believed to be the boundary line on lot 5, providing lot 5 with access to the lake, the dock, and the side yard.

In January 1997, Dan and Laurie Starko bought lot 5 from Mr. Jackson. In August 1999, Jack and Vickie Wood bought lot 4 from Bob and Beth Pritchard, who had previously purchased lot 4 from Mr. Jackson. The disclosure statement provided by the Pritchards to the Woods at closing noted that the Starkos' rear sidewalk was an encroachment on the property which may affect their ownership interest. Relying on this assertion, Mr. Wood hired a surveyor, Steven Artz, to determine the boundary line between lots 4 and 5 and the ownership of the sidewalk. Mr. Artz ultimately determined that the entire sidewalk was on the Woods' property. At this time, the Starkos were building a pool in their backyard, and an agreement regarding the use of the sidewalk was reached between the parties so that construction could continue.

However, civilities between the parties apparently ceased on November 30, 2001, when Mr. Starko and Mr. Wood met to discuss the sidewalk. Although the details of the discussion are disputed, it is uncontroverted that the next morning, Mr. Wood had a crew destroy the 30–foot section of the sidewalk which was allegedly on lot 4 and erect chicken wire along the believed boundary line. The Starkos as-

sert that while tearing out the sidewalk, Mr. Wood's crew damaged underground electrical wiring for security lights and an irrigation system and that the crew's demolition increased the costs of building the pool because the Starkos' men and equipment were no longer permitted to traverse between the homes.

After the destruction of the sidewalk, the Starkos employed Mr. Diel to re-survey the properties. Mr. Diel concluded that based on the original recorded subdivision plat and the developer's original concrete monuments, the sidewalk was located completely on the Starkos' property. However, in March 2002, the Woods employed Bruce Rainey to survey the properties. Mr. Rainey concluded that the original subdivision boundaries had to be shifted in order to meet the pins in the Corps of Engineers' line, an adjacent landowner, and in doing so, the sidewalk was located on the Wood's property.

Finally, the Starkos commissioned Jackie Dillehey to study the findings of Mr. Diel, Mr. Artz, and Mr. Rainey and to determine the proper placement of the boundary line. Mr. Dillehey concluded that the rear boundary line of the lots and the Corps of Engineers' line clearly did not meet but that the original recorded plat had to control. By maintaining the boundary line established in the original subdivision plat and merely extending the line to meet the Corps of Engineers' line, the entirety of the sidewalk remained on the Starkos' property.

On July 30, 2002, the Woods filed a suit in the Sumner County Chancery Court seeking a declaration placing the boundary line between lots 4 and 5. The Starkos filed a counterclaim asking the trial court to recognize the property boundaries in the original recorded plat and seeking damages for the removal of the sidewalk. After a bench trial, the court determined that the boundary line should be drawn consistent with Mr. Rainey's testimony. Although the trial court dismissed the Starkos' counterclaim in its final order, the court made a provisional oral ruling that if the Court of Appeals were in disagreement as to where the court placed the boundary line, then the Starkos proved damages of $2,225 for the destruction of the sidewalk. The Starkos filed a timely notice of appeal.

On appeal, the Starkos contend that (1) the trial court erred in determining that the sidewalk was on the Woods' property by drawing the boundary line consistent with Mr. Rainey's testimony; and, (2) the trial court's statements concerning the Starkos' damages should not be given effect because the statements were superceded by a subsequent written order.

▮ The review of a decision rendered in a boundary dispute is *de novo* upon the record with a presumption of correctness as to the trial court's findings of fact, unless the evidence preponderates against those findings. *Boarman v. Jaynes,* 109 S.W.3d 286, 290 (Tenn.2003). In order for the evidence to preponderate against the trial court's findings of fact, the evidence must support another finding of fact with greater convincing effect. *Rawlings v. John Hancock Mut. Life Ins. Co.,* 78 S.W.3d 291, 296 (Tenn.Ct.App.2001).

The Starkos first assert that the trial court improperly applied the priority of markers and that such application was contrary to the intent of the developers of the subdivision. The trial court stated in its oral ruling on June 11, 2004:

> To the issue of the property line between Lots 4 and 5. Of course, the Court examined the testimony of the four expert witnesses, those of Mr. Wood and Mr. and Mrs. Starko. The Court also examined the exhibits. The Court also looked at several cases. One of those

cases, *Thornburg v. Chase* 606 S.W.2d 672 (1980). In that case, that's a Tennessee Appeals case, in that case at page 672 reads: "In determining disputed boundaries resort is to be made first to the natural objects or landmarks, because of their very permanent character. Next, the artificial monuments or marks. Then, the boundary lines of adjacent land owners. And then, the courses and distances."

There is no evidence in this case of any natural objects or landmarks. The artificial monuments are concrete monuments and iron pins that have been set by surveyors. The Court did not overlook originally found broken concrete monument or consider the testimony somehow that it was wrongly set. I considered that by Mr. Rainey. I considered that testimony, did not necessarily find that it was somehow erroneously set or who set it. What the Court finds is that there is a T-bar, Corps of Engineers' pin just below that broken concrete monument that was found recently.

In looking at the testimony of these expert witnesses, the Court does, even looking and disregarding these erroneously setting testimony, the Court accepts the testimony of Bruce Rainey as it relates to the boundary line between Lots 4 and 5. To do otherwise, is to have land at the rear of Lots 4 and 5, owned by Dotson & Rhoten Development Company Incorporated. In other words, the Court makes a finding that it was the intent of Dotson & Rhoten that the rear boundary of Lots 4 and 5, extends to the Corps of Engineers' property lines. And this is keeping with Thornberry & Chase, where we do take a look in that order, the boundary line of adjacent land owner. I look at the boundary line of adjacent land owner which is the Corps of Engineers.

It was not the intent of the corporation to retain land between the Corps' line and the rear of lot Line 4 and 5. Mr. Starko obtained a Quitclaim Deed from Dodson & Rhoten Development Incorporated conveying any of that land to him. His counter-complaint also states that it was the intent of Dodson & Rhoten to extend the boundary line to each of its lots to the Corps of Engineers' property. It appears that both parties would be in agreement on that issue.

Having established that the boundary line as that drawn by Mr. Rainey, then the counter-complaint is dismissed.

The priority of markers in a boundary dispute is well settled in Tennessee. As the trial court noted in its oral ruling, in *Thornburg v. Chase,* 606 S.W.2d 672, 675 (Tenn.Ct.App.1980), this Court stated that "[i]n determining disputed boundaries, resort is to be had first to natural objects or landmarks, because of their very permanent character; next, to artificial monuments or marks, then to the boundary lines of adjacent landowners, and then to courses and distances."

Based on the testimony of Mr. Rainey and the *Thornburg* case, the court concluded that the boundary line between lots 4 and 5 should be re-drawn according to the Corps of Engineers' pin, which is an adjacent landowner boundary line created 11 years after the subdivision plat at issue in this case. In doing so, the court showed no regard for the priority of the original concrete marker and erroneously placed the importance of original artificial markers secondary to the boundary line of an adjacent owner.

Relying on *Thornburg,* the court reasoned that the developers must have intended to align the boundary line between lots 4 and 5 with the Corps of Engineers' pin, otherwise, the developers retained the

land between the Corp of Engineers' line and the rear lines of lots 4 and 5. While we agree that the developers intended for the rear lines of lots 4 and 5 to meet the Corp of Engineers' boundary line, we disagree with the methodology used by the court to obtain an intersection with the Corps of Engineers' line.

■ This is a suit over a boundary line between adjacent lots in a platted subdivision. Neither the United States Corps of Engineers nor any other persons are parties to the lawsuit. The difficulty with the Woods' position in this case centers around their surveyors' heavy reliance on lines established according to a Corps of Engineers' survey made 11 years after the survey of the platted subdivision. The lines drawn by the Corps of Engineers are immaterial to the issues between these parties. Both the Starkos and the Woods purchased their respective lots in accordance with the platted survey of Winston Place section 1, recorded May 8, 1973, in plat book 8, page 40 in the Register's Office of Sumner County, Tennessee. The survey of the subdivision was accomplished by Turner Engineering Co., Inc. It is agreed by all parties that the platted survey is based upon no natural objects or landmarks. In order of priority, one must then look to artificial monuments or markers before ever relying on boundary lines of adjacent land owners or courses and distances. *Thornburg*, 606 S.W.2d at 675.

The governing rules are near universal and are recited by the Court of Appeals of Ohio in *Sellman v. Schaaf*, 26 Ohio App.2d 35, 269 N.E.2d 60, 66 (1971).

In 11 C.J.S. Boundaries § 3, p. 540, it is said:

"It has been declared that all the rules of law adopted for guidance in locating boundary lines have been to the end that the steps of the surveyor who originally projected the lines on the ground may be retraced as nearly as possible; further, that in determining the location of a survey, the fundamental principle is that it is to be located where the surveyor ran it. Any call, it has been said, may be disregarded, in order to ascertain the footsteps of the surveyor in establishing the boundary of the tract attempted to be marked on the land; and the conditions and circumstances surrounding the location should be taken into consideration to determine the surveyor's intent."

In Clark, Surveying and Boundaries (2d Ed.1939), it is said at page 727, Section 665:

"The original survey must govern if it can be retraced. It must not be disregarded. So, too, the places where the corners were located, right or wrong, govern, if they can be found. In that case a hedge planted on the line established by original survey stakes was better evidence of the true line than that shown by a recent survey. In making a resurvey it is the surveyor's duty to relocate the original lines and corners at the places actually established and not to run independent new lines, even though the original lines were full of errors."

In 6 Thompson, Real Property, 594, Description and Boundaries, Section 3047 (1962 replacement), the following is stated.

"The line actually run is the true boundary, provided the essential survey can be found and identified as the one called for, and prevails over maps, plats, and field notes. * * * The lines marked on the ground constitute the actual survey and where those lines are located is a matter to be determined by the jury from all the evidence. If the stakes and monuments set at the corners of the parcel in making the survey have disap-

peared, it is competent to show their location by parol evidence."

At page 599, Section 3049, it is further said that:

"Marked corners are conclusive and will control over courses and distances. Although stakes are monuments liable to be displaced or removed, they control so long as it is certain that they mark the corners of the original survey."

*Sellman,* 26 Ohio App.2d 35, 269 N.E.2d 60 at 66.

Clearly encompassed in this rule is the fact that it is the monuments laid out by the original surveyor, if they can be located, which govern the boundaries, even if the actual survey used in the plat is in error.

Moreover, in ascertaining the lines of land or in re-establishing the lines of a survey, the footsteps of the original surveyor, so far as discoverable on the ground by his monuments, should be followed and it is immaterial if the lines actually run by the original surveyor are incorrect. *Vaught,* 116 Mont. at 550, 155 P.2d at 616 (citing *Ayers v. Watson* (1891), 137 U.S. 584, 11 S.Ct. 201, 34 L.Ed. 803; *Galt v. Willingham* (5th Cir. 1926), 11 F.2d 757). *See also Buckley v. Laird* (1972), 158 Mont. 483, 491–92, 493 P.2d 1070, 1074–75.

*Olson v. Jude,* 316 Mont. 438, 73 P.3d 809, 815 (2003).

In a dispute between adjacent lot owners in a platted subdivision, the Supreme Court of Washington wrestled with differing opinions of professional surveyors and ultimately affirmed the trial court judgment reasoning:

Where a plat contains substantial mathematical errors and discrepancies and with the passing of time questions arise concerning the true boundaries among its component parcels, the question to be answered is not where new and modern survey methods will place the boundaries, but where did the original plat locate them. The main purpose of a resurvey is to rediscover the boundaries according to the plat upon the best evidence obtainable and to retrace the boundary lines laid down in the plat. 12 Am.Jur.2d Boundaries § 61 (1964). Effort should be made to locate the original corners. Despite discrepancies in the original plat, the known monuments and boundaries of the original plat take precedence over other evidence and are of greater weight than other evidence of the boundaries not based on the original monuments and boundaries. Clark, Surveying and Boundaries § 258 (3d ed.1959).

Courts should ascertain and carry out the intention of the original platters. In case of discrepancy, however, between lines actually marked or surveyed on the ground and lines called for by plats, maps or filed notes, the lines marked by survey on the ground prevail (*Stewart v. Hoffman,* 64 Wash.2d 37, 390 P.2d 553 (1964); 11 C.J.S. Boundaries § 49c (1938)).

*Staaf v. Bilder,* 68 Wash.2d 800, 415 P.2d 650, 652 (1966).

Analogous to the case at bar is *Akin v. Godwin,* 49 So.2d 604 (Fla.1951). In that case, the parties were owners of adjacent lots in a platted subdivision with the plat of record prepared by A.L. Knowlton, engineer. The owner of lot 3 constructed a building supported by three concrete pillars along the boundary line between lots 3 and 4. Plaintiff bought lot 4 and, relying on a sketch prepared well after the subdivision was platted, concluded that the concrete encroached upon lot 4. He sued in ejectment and, following a jury verdict for Plaintiff, the owner of lot 3 appealed. In

reversing and remanding, the Supreme Court of Florida held:

Both Lot Three and Lot Four were conveyed to their respective owners with reference to a plat made by A.L. Knowlton, C. E., in the year 1896 duly recorded in the public records of Dade County, Florida. Since this plat is, then, as much a part of the deeds as if copied therein, *see Routh v. Williams,* 141 Fla. 334, 193 So. 71, and *Kahn v. Delaware Securities Corporation, supra,* the real question in this case is: What is the boundary line between Lots Three and Four, *according to the Knowlton plat?*

The plaintiff based her claim of title squarely on the Garris survey of Lot Four; and, as heretofore stated, the verdict and judgment were likewise based thereon. Mr. Garris testified that he made his survey by first ascertaining the block boundaries, as marked by the city monuments establishing the locations and boundaries of the streets on the four sides of Block Fifty; that he then pro rated "any excess of [sic] deficiency in said block," and that the sketch of Lot Four represented the true dimensions of that lot "as pro rated." It appears that the city monuments were established by the so-called Klyce survey undertaken by the City of Miami in 1914 or 1915 for the purpose of establishing the location and marking the boundaries of the city streets, but there is nothing in the record to show what monuments or methods were pursued by Klyce in making his survey.

The plaintiff also adduced the testimony of one Elmore Cormack, a registered civil engineer and surveyor in the employ of the Dade County Surveyor, in an effort to establish the accuracy of the Garris survey. Cormack's testimony showed, however, that he also used the city monuments established by the Klyce survey as the starting point in his survey, and he testified that his survey did not necessarily "go back to the original Knowlton field notes."

It is apparent that, as evidence of the true boundary of Lot Four according to the Knowlton plat, both the Garris and the Cormack surveys suffer from the same infirmity, that is, neither made any effort to retrace the Knowlton survey, nor does it appear that either survey is in any way, either directly or indirectly, related to or tied in with the Knowlton plat, insofar as the exact location, on the ground, of the boundary lines of Lot Four is concerned.

In making a resurvey, the question is not where an entirely accurate survey would locate the lines, but where did the original survey locate such lines. Clark on Surveying and Boundaries, 2d Ed., Sec. 411, page 495; *Kahn v. Delaware Securities Corporation,* 114 Fla. 32, 153 So. 308; *LeCompte v. Lueders,* 90 Mich. 495, 51 N.W. 542; *City of Racine v. Emerson,* 85 Wis. 80, 55 N.W. 177; *Dittrich v. Ubl,* 216 Minn. 396, 13 N.W.2d 384. As stated in 8 Am.Jur., Boundaries, Section 102, page 819: "The object of a resurvey is to furnish proof of the location of the lost lines or monuments, not to dispute the correctness of or to control the original survey. The original survey in all cases must, whenever possible, be retraced, since it cannot be disregarded or needlessly altered after property rights have been acquired in reliance upon it." It is generally held, therefore, that a resurvey that changes lines and distances and purports to correct inaccuracies or mistakes in an old plat is not competent evidence of the true line fixed by the original plat. *See Dittrich v. Ubl,* 216 Minn. 396, 13 N.W.2d 384; *Cragin v. Powell,* 128 U.S. 691, 9 S.Ct. 203, 32 L.Ed. 566; *City of*

*Racine v. Emerson,* 85 Wis. 80, 55 N.W. 177, 178.

. . .

As stated in 8 Am.Jr., Boundaries, Sec. 59, page 78: "Purchasers of town lots generally have the right to locate their lot lines according to the stakes as actually set by the platter of the lots, and no subsequent survey can unsettle such lines. In the event of a subsequent controversy the question becomes not whether the stakes were located with absolute accuracy, but whether the lots were purchased and taken possession of in reliance upon them. If such was the case, the rule appears to be well established that they must govern notwithstanding any errors in locating them." *Akin,* 49 So.2d at 606–07.

While these general rules apparently have their origin in surveys reflecting government grants, such rules are equally applicable to private surveys. *Staub v. Hampton,* 117 Tenn. 706, 101 S.W. 776, 781 (1907).

'It is a familiar principle of our system, and one in reason applicable to this species of title, as well as any other, that it is the work on the ground, and not on the diagram returned, which constitutes the survey, the latter being but evidence (and by no means conclusive) of the former ... It is conceded that the patent may be rectified by the return of survey; and why not the return of survey by the lines on the ground, and particularly the numbered tree, which is the foundation of the whole?' In the latter case, Kennedy, J., said: 'That the original lines as found marked on the ground must govern, in determining the location and extent of the survey, is a well-established rule, in general applicable to all cases.' ... 'We know, in point of fact, that the marks made on the ground at the time of making the survey are the original, and therefore the best evidence of what is done in making it; that everything that is committed to paper afterwards in relation to it intended and ought to be, as it were, a copy of what was done, and ought to appear on the ground, in the doing of which errors may be committed, which renders it less to be relied on than the work as it appears by the marks made on the ground.' 46 Pa., [477,] 484, 485 [1864]. *Staub,* 101 S.W. at 784.

It is well to note that the Diel survey of lot 5 conforms almost exactly to the recorded subdivision lines. This conformity is buttressed by the late-found concrete marker located at the northwest corner of lot 4. The Rainey survey, on the other hand, establishes the northwest corner of Lot 4 and the northeast corner of lot 4, not by reference to original markers laid down in the 1973 plat of survey, but rather by markers placed on the ground in 1984 by the Corps of Engineers at the time of its survey.

Reference to the original plat of the subdivision in 1973 discloses that from the northwest corner of lot 4 to the northeast corner of lot 5, the calls are North 88 degrees, 20 minutes East, 108.73 feet; South 79 degrees, 15 minutes East, 132.23 feet. The corresponding calls on the Diel survey are exactly the same. The calls on the Rainey survey reflecting the same northern boundary as to lot 4 are North 81 degrees, 58 minutes, 21 seconds East, 91.19 feet. Mr. Rainey begins this portion of his survey in the northwest corner of lot 4, but his beginning marker is a Corps of Engineers' T–Bar marker set in 1984, 11 years after the markers put down by the original surveyor. An elongation of this Rainey line for an additional 17.58 feet would reach another Corps of Engineers' T–Bar marker from whence proceeding eastwardly with the Corps of Engineers'

line (not the original plat line) the call from this second Corps of Engineers' marker to the northeast corner of lot 5 as such is disclosed by the Corps of Engineers' map is South 74 degrees, 23 minutes, 45 second East, 130.66 feet. The difference between the calls in the Diel survey and the calls in the Rainey survey produce the "no-man's land" existing between the northern boundaries of the lots reflected by the original survey and by the Diel survey and those same northern boundaries as reflected regarding lot 4 by the Rainey survey and as to lot 5 by the Corps of Engineers' survey.

■ Thus, all important becomes the concrete marker located by Mr. Diel shortly before the trial several feet to the south of the Corps of Engineers' T–Bar marker used by Mr. Rainey as the northwest corner of lot 4. The concrete marker was used by Mr. Diel to reflect that same northwest corner. The newly discovered concrete marker corresponds with the northwest corner of lot 4 as established both in the Diel survey and in the original plat of the subdivision.

It necessarily follows that in establishing the northern boundary of both lots, Mr. Rainey felt compelled to eliminate the "no-man's land" by conforming the northern boundary of the two lots to the line established by the Corps of Engineers' 1984 survey. Indeed, it was the existence of this "no-man's land" which impelled the trial judge to accept Mr. Rainey's survey in preference to the Diel survey. In this, the trial court erred. These two land owners purchased their respective lots in reliance upon the subdivision plat, and the Diel survey reflects the lines as they appear on the subdivision plat. The original markers on the ground from the 1973 survey of Turner Engineering Company, from which the plat resulted, conformed to the lines established both in the subdivision plat and the Diel survey.

The very existence of the "no-man's land" assumes the accuracy of the Corps of Engineers' survey, an assumption that is based upon no proof. If there is in fact a "no-man's land," it is a matter that addresses itself to both the Woods and the Starkos on the one hand and the United States Corps of Engineers on the other. The survey by the Corps of Engineers prepared 11 years after the original plat of survey cannot affect the boundary line between lots 4 and 5 as established by the very plat on which both parties relied in their original purchase.

Because the original subdivision plat delineates by metes and bounds the north boundary of both lots 4 and 5, and the later survey by the Corps of Engineers does not join the northern boundaries of these two lots as established by the subdivision plat, an "on-paper" no man's land separates these properties from the lake front. Although, unquestionably the properties are intended to be lake front properties, the only person or entity with standing to complain of use by either the Starkos or the Woods of this "no man's land" is the United States Government by way of the Corps of Engineers, and the United States Government is not a party to this case.

■ Because we have reversed the trial court's determination concerning the boundary line, it is necessary to address the damages the Starkos are entitled to as a result of the wrongful destruction of their concrete sidewalk. The court made a provisional oral ruling on June 11, 2004, contemplating reversal by this Court. The court stated:

Having established the boundary line as that drawn by Mr. Rainey, then the counter-complaint is dismissed. Mr.

Wood had no damages because of defendant counter-plaintiff.

The Court would point out, however, that if the Court of Appeals is in disagreement with where the Court has placed the boundary line, or in disagreement with the Court's reasoning, the Court would find that Mr. Starko did suffer some damages because of the actions of Mr. Wood. It's proven, he has, to the satisfaction of this Court, proven, $2,225 worth of damages. And I will state that that is the damages that were filed by the individual who testified concerning putting in a new sidewalk.

As far as the request for damages for delay caused by this boundary dispute, or in completion of the swimming pool, the Court finds that there is a lack of causation before the Court.

On the request for damages as far as the lighting and electrical wiring it's just insufficient. There was no testimony concerning 12 lights until there was testimony from the witness who testified as far as putting in new lights, and putting in electrical wire. There was testimony that with the tearing up the sidewalk, there was some electrical wiring removed. The damages put into evidence by the electrician were the electrical wiring, more in the opinion of the Court, it didn't accurately reflect, it was not sufficient testimony to carry the burden of proof as opposed to those damages. So we'll have an order prepared reflecting the opinion of the Court. And this matter is in final disposition. The parties can make a decision about an appeal.

■ The Starkos challenge the provisional oral ruling, arguing that the court's oral statements were superceded by a subsequent written order. The August 11, 2004, written order of the court stated:

This cause came on to be heard before the Honorable Tom Gray on the 12th day of June, 2004 upon the pleadings, the testimony of lay and expert witnesses, the arguments of counsel and the entire record, upon all of which it satisfactorily appears to the Court, and IT IS HEREBY ORDERED, ADJUDGED, and DECREED that:

1. the mutual boundary between the parties' properties is established in accordance with the testimony and plat of Bruce Rainey;

2. the counter-claim is dismissed;

3. costs are adjudged against the Defendants, for which execution may issue, if necessary.

"It is a well-established principle of law in this jurisdiction that: 'A Court speaks only through its written judgments, duly entered upon its minutes. Therefore, no oral pronouncement is of any effect unless and until made a part of a written judgment duly entered.'" *Evans v. Perkey,* 647 S.W.2d 636, 641 (Tenn.Ct.App.1982) (citing *Sparkle Laundry & Cleaners, Inc. v. Kelton,* 595 S.W.2d 88, 93 (Tenn.Ct.App. 1979)). Because the trial court only included its provisional findings regarding damages in its oral ruling and not in its written judgment, the case must be remanded to the trial court to determine the amount of damages due to the Starkos under the counterclaim.

Like the lot owners in *Linn v. Elrod,* No. 03A01–9903–CH–00080, 1999 WL 1081265, at *4 (Tenn.Ct.App. Dec.1, 1999) our determination binds only the lot owners who are the parties to this litigation. Any litigation relative to rights in and title to any land that could conceivably lie north of the boundaries to the Woods–Starko properties must be determined between Woods–Starko and any persons or entities claiming such interests. Similar cases involving lots adjacent to navigable waters

would involve principles laid down in *State v. Brazos River Harbor Navigation Dist.*, 831 S.W.2d 539 (Tex.App.1992) and *Norrell v. Aransas County and Navigation Dist. No. 1,* 1 S.W.3d 296 (Tex.App.1999). There is no such issue to be determined between the parties to this case.

The judgment of the trial court is reversed, and the case remanded for further proceedings. Costs of the cause are assessed to Appellants.