# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
May 2, 2011 Session

## RICHARD L. HOLLOW, TRUSTEE v. BEULAH BUTLER, ET AL.

**Appeal from the Chancery Court for Roane County**
**No. 15,638     Frank V. Williams, III, Chancellor**

_____

### No. E2010-02150-COA-R3-CV-FILED-JULY 26, 2011

_____

Richard L. Hollow, Trustee ("Plaintiff") sued Beulah Butler with regard to a boundary line dispute. After a trial, the Trial Court entered its order finding and holding, *inter alia*, that the common boundary line between Plaintiff's real property and Ms. Butler's real property is as shown on a September 17, 2003 survey prepared by Plaintiff's surveyor, James Ogle, and that Ms. Butler had not proven adverse possession, laches, or gross laches. Ms. Butler appeals to this Court. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and D. KELLY THOMAS, JR., SP. J., joined.

J. Polk Cooley, Rockwood, Tennessee, for the appellant, Beulah Butler.

Jack H. McPherson, Jr., Kingston, Tennessee, for the appellee, Richard L. Hollow, Trustee.

E. H. Rayson, and Charles M. Finn, Knoxville, Tennessee, for the appellees, George Ed Wilson, III; Emmie Wilson Fisher; Chalmers R. Wilson; and Madge Cleveland.

# OPINION

## Background

Plaintiff and Ms. Butler own adjoining tracts of land in Roane County, Tennessee. In 2006, Plaintiff sued Ms. Butler over a boundary line dispute. Plaintiff later was granted permission to add George Ed Wilson, III; Emmie Wilson Fisher; Chalmers B. Wilson; Madge Cleveland; and the Wilson Partnership, L.P. ("the Wilson Defendants") as party defendants to the suit. Plaintiff alleged that the Wilson Defendants had promised that the property they sold to Plaintiff's predecessor in title was free of boundary disputes and challenges to title. The case was bifurcated, and Plaintiff's suit against Ms. Butler proceeded to trial. Plaintiff's action against the Wilson Defendants was scheduled for trial at a later time.

In 1946, Ms. Butler and her husband, Warren Butler, took title to approximately 78 acres by Warranty Deed from Roy Bryant and Enloe Bryant. In 1948, Ms. Butler and her husband took title to approximately 59 acres by Warranty Deed from Hugh L. Moore and Frances Moore. Ms. Butler's husband has since died, and Ms. Butler is the sole owner of her property ("the Butler Property").

In 1941, G. E. Wilson, Jr. took title to over 1,000 acres by Warranty Deed from the Equitable Life Assurance Society of the United States. In 1961, G. E. Wilson, Jr. took title to approximately 50 acres by Special Warranty Deed from the Tennessee Valley Authority. Mr. Wilson subsequently deeded interests in his property ("the Wilson Property") to the Wilson Defendants. In 2003, Johnson Bend Properties received title to the Wilson Property by Warranty Deed from G. E. Wilson, Jr. and the Wilson Defendants. Johnson Bend Properties subsequently sold approximately 1,100 acres and retained 60 acres. Johnson Bend Properties then transferred the remaining property to Plaintiff as trustee.

Plaintiff's case against Ms. Butler was tried in July of 2010. The area in dispute in this suit involves approximately twenty acres ("Disputed Area"). At trial, surveyor Jimmy Darrell Ogle testified. Mr. Ogle surveyed the Wilson Property in the fall of 2003 and reviewed the relevant deeds. Mr. Ogle explained that the particular line at issue in this lawsuit is the northwest line of the Wilson Property. When asked about his survey, Mr. Ogle agreed that the total boundary line closely followed the description of the property contained in the 1941 deed by which Mr. Wilson took title. When surveying the Wilson Property, Mr. Ogle located the stone piles and monuments called for in the relevant deeds. Mr. Ogle also reviewed the tax map and testified that it agrees with his survey map. Mr. Ogle testified that the tax map, the TVA map, the deeds, and his own map "all compare almost exactly the same." He further stated that the deed calls and distances are compatible.

Mr. Ogle described the Disputed Area stating:

The terrain is very steep on the north side of the old fence that's in question, more gently sloping on the south side. Along where the property line and corners are at, it's more steep in that area. And it's - - you know, it's wooded. Both sides I could not tell a real difference in the timber on either side. It appeared at some point in time all of the timber had been cut. There was stumps, very old stumps. So it had been quite some time when the timber had been cut.

\* \* \*

There was some wood fence posts. And they would have been affixed to it and the parts that we found with a little horseshoe nail nailed to it. But all of the wooden fence posts were broke off, rotted off where it had been a long time. There were a few metal posts where - - …. Pointing to the area just south of corner A along the main top of the ridge where we actually located the fence in question at that time…. On the actual trees where there were trees, it had been affixed to it probably with some type of nails. And on most places on all the trees, the fence was grown inside. So it was being broke off just as it come out of the tree.

Mr. Ogle testified that the wire for the fence was attached to the south side of the trees and posts, which is the Wilson side of the boundary line.

In addition to being a surveyor, Mr. Ogle has a farm where he keeps cattle, which he keeps fenced in. When asked on which side of the fence posts he places the wire for his cattle fences, Mr. Ogle stated:

I place them on my side for the main purpose that they are my cattle that I'm trying to keep in. And if you - - normally, if you put the fence on the other side, the cattle could push it down. And that's the reason you put the fence on the side that you are trying to retain the cattle in.

Mr. Ogle has been in the Disputed Area ten to fifteen times from 2003 to the time of trial. He never has seen any cows in the Disputed Area. When asked if he had seen any animals in the Disputed Area, he stated: "I seen one, I think, deer one time." In the Disputed Area Mr. Ogle did not see any trails in the woods, any evidence of cultivation, any

-3-

signs or sign posts, or any animal carcasses. He also never saw any people, grass, water, water troughs, or manure piles in that area. When asked specifically if he searched for manure piles, Mr. Ogle stated: "I have searched from the fields from the pasture. I have searched from there to the top of the ridge up and down it everywhere looking for some other type of evidence.... Trying to find something that would dispute the line." Mr. Ogle testified that the stone piles he located were his clue about where the property line was.

Charles Douglas Irwin is one of the partners of Johnson Bend Properties. Mr. Irwin testified that he had been on the Wilson Property: "Sometime before we purchased it in '03. We were on it several times and subsequent to that." Mr. Irwin explained that the Wilson Property was "1,160 acres, approximately." He stated: "Part of it was wooded, part of it was open fields that had cattle on it, and part of it was in hay." He also stated that there were numerous cross fences on the Wilson Property that were "[w]ove wire, hog fence type wire."

Mr. Irwin testified that after purchasing the Wilson Property, Johnson Bend Properties sold around 1,100 acres and retained 60 acres. The 60 acre tract is located in the northwest corner of the entire parcel. There is a ridge located toward the middle of the 60 acres.

When Mr. Irwin was on the ridge he saw "pieces of fence. Old, I guess, remnants or abandoned fence that - - some wiring attached to trees, most of it laying under the leaves." He stated that the wire on the fence is on the Wilson side of the boundary line. He further stated that: "Most of [the fence he saw] was under the leaves," and was not sufficient to contain livestock. When asked, Mr. Irwin agreed that it is a very old fence. Mr. Irwin testified that the area from the top of the ridge looking toward the Butler Property is "very, very steep.... It's steep. If you went up that hill side, you would put your hands in front of you to touch the ridge line to get up it." Mr. Irwin did not see any structures in the Disputed Area, nor did he see any animals, evidence of cultivation, signs, or animal carcasses.

William D. McSpadden also is a partner of Johnson Bend Properties. Mr. McSpadden testified that he has been on the ridge on many occasions since they purchased the Wilson Property. Mr. McSpadden first became aware that there were remnants of a fence:

> After we had hired a chipper to come up there and clear it. Well, first of all, Tennessee Lands and Lakes, the Macri Group, made a road for us to get up to the ridge. And once that happened, we wanted to see what the views were like and whatnot. So we hired a chipping company to come in and chip. And

that's when we first saw that there were remnants of a fence.

He testified that they did the chipping several weeks after the road was built. Mr. McSpadden estimated that they knocked down and chipped about one hundred trees. He stated: "the condition of the fence at the time I saw it before chipping didn't look any different than it did after chipping."

When asked about any evidence that he saw of use of the property, Mr. McSpadden stated:

> The only evidence that I saw was there might be a section where there was a tree and a wire or a hog wire down on the ground. And it would connect to a tree through the tree. And then it might be nothing for the next, you know, 50, 100 feet. So that was the condition of the fence. It just wasn't a fence.

When asked, Mr. McSpadden agreed that the Disputed Area was forest, and that he never saw any animals, people, structures, signs, or evidence of cultivation in this area. He stated: "The times that we went up there before, I mean, you could see that there was a fence. But some of it would be down and buried with leaves and growing through a tree. And it would be broken off. And it was the same after it was chipped." Mr. McSpadden stated that the fence would not confine livestock because one could step over it.

When asked how much time he had spent in the Disputed Area, Mr. McSpadden stated: "I spent probably a lot more time than most of the rest of the partners because I would take my family there. And we would spend every weekend on the farm for the last three or four years." He explained that he started taking his family there after the road was built.

Morgan Alexander Schubert, Jr. also is a partner of Johnson Bend Properties. Mr. Schubert explained that prior to Johnson Bend Properties purchasing the Wilson Property, the land was being leased to Glen Long who had cattle on it. Mr. Long maintained fences to contain his cattle.

Mr. Schubert testified that he went to the ridge after the roadway was built. He stated:

> I found that they had not cut to the complete top of the cress [sic]. They cut to about elevation, 1060. And the very top of that is at elevation 1090. But I found another old dilapidated stock fence.… It was actually of the same age,

-5-

style, same fencing [as maintained by Mr. Long], but it was in a lot worse condition. It didn't look like it had any maintenance done over the years.… It was predominantly - - the majority of it was predominantly nailed to trees and growing into the tree trunk.… The entire length of the old stock fence was on the Wilson side of the tree.

When asked if the fence was sufficient to contain animals, Mr. Schubert stated:

No, sir.… Well, the trees had been falling through it over the years. Some of them were eight to 10 inches deep into the trunks where the trees growing had pulled the wire and broken it. It was in complete disrepair with the exception of possibly the end of it down close to the Butler, Vitito, Johnson - - what we have always called the triangle and the pile of stones.

Mr. Schubert described a portion of the fence wire as pictured in one of the exhibits stating:

It's coming through about 12 inches of tree. And then it's going down to the ground which tells me that at some point in time, a tree fell through it, pinned it to the ground, leaf mulch got over it. At this point, it's been in the ground so long that the entire tree has rotted and gone.

Mr. Schubert testified that, when he was walking in the Disputed Area, he saw no people, structures, cattle, signs, trails, or evidence of cultivation. He described the woodland as "very dense." Mr. Schubert testified that he raises cattle and that he does not think that cattle could get up on the ridge. When asked if he thought that cattle would be up around the old fence, he stated: "It's possible that they could. It's not probable."

George Wilson, III is the son of G. E. Wilson, Jr. who took title to the Wilson Property in 1941. He is familiar with the Wilson Property because his family had a summer cottage on it and used it for recreational purposes. Mr. Wilson testified that his father also leased the property for cattle. Mr. Wilson explained that the lessees were entitled to move or establish fences as needed and that there were many interior fences on the Wilson Property.

In the 1990s, Mr. Wilson's father established a partnership and gifted interests in the Wilson Property to Mr. Wilson, Mr. Wilson's sisters, and Mr. Wilson's mother. When Mr. Wilson and his family members sold the Wilson Property they executed an affidavit that stated, in part, that there were no known boundary disputes with adjoining landowners. Mr. Wilson's father signed this affidavit in addition to the other family members who had

-6-

ownership interests in the Wilson Property. Mr. Wilson stated: "We knew that a survey had been conducted prior to the sale that did not contradict the deed descriptions."

Bob Easter lives approximately two and a half miles from the Wilson Property. Mr. Easter testified that he has lived in that community all of his life. Mr. Easter worked with a local veterinarian and was a sort of cattle doctor. He knew the Butlers and had pulled calves for them. Mr. Easter started visiting the Butler Property back in the early 1950s. Mr. Easter testified that he recognized the fence in question as a boundary and stated: "I reckon everybody did."

When asked if he was aware of any cattle getting into the wooded area of the Disputed Area, Mr. Easter stated:

> If you got cattle, they are going to get anywhere…. Yeah. They was up in there. Well, since Warren died - - I believe he has been dead 12 or 15 years. And I had Beulah call me to go up there and check about a calf since then - - I mean, then, you know. And there was a fence up there then…. Yeah. The cow was right up next to the fence…. Yeah, it was dead…. Yeah. She wanted me to see what was wrong, if I could figure out what killed it…. Yeah. It was just that one time, I guess. No. Let's see. I had - - we had one not too long ago, didn't we Beulah? Yeah. Billy Joe helped me with it. Yeah.

Mr. Easter testified that he considered the fence in the Disputed Area adequate to contain cattle. He further testified that he has seen cattle go up the slope to the fence, and that there was something up there for the cattle to eat. He admitted when questioned that the way up the slope is "pretty steep." When asked about what cattle typically do, Mr. Easter stated: "They will take the easier part to walk on." Mr. Easter never has seen any structures in the woods, and testified that there is no water in the woods, and no water troughs. He also stated that cows mostly eat grass and admitted that there is no grass in the woods. Mr. Easter also has been on the Wilson Property, and he testified that the Wilson Property has interior fences as does the Butler Property.

Beulah Butler, who was 90 years old at the time of trial, testified that she has lived on the Butler Property since 1948. Ms. Butler recognized the fence as her property line and stated that her husband either patched the fence or hired people to do so. She also testified that people in the community would ask for permission to use the land to hunt or cut wood or just walk, and Ms. Butler stated that she and her husband would tell people that the fence was the property line. Ms. Butler admitted that neither she nor her husband built the fence as it was there when they purchased the property. The Butlers never put up signs to mark their boundary. Ms. Butler testified that, when their cows got out, the Butlers would

repair the part of the old fence from where the cows had escaped.

Ms. Butler explained that she and her husband ran a dairy cattle business for approximately 28 years and then switched to beef cattle. When asked if the cattle were permitted to go up the slope to the fence she stated: "Well, yeah. They went wherever they wanted to in the pasture." When asked about cattle being able to get up the steep slope, Ms. Butler stated: "Well, they pick sideways, you know. They go and they just pick until they're eventually on the top." Ms. Butler believed the cattle could get to the top of the ridge if they wanted to and that they have done so. When questioned, Ms. Butler admitted there is no water for the cattle on the ridge and stated: "They come down and get water." When asked if there was anything for the cattle to eat, she stated: "Well, I guess they just prowl around hunting something." When questioned further, Ms. Butler admitted that the cattle stayed around the lake most of the time, not in the woods in the Disputed Area.

Ms. Butler admitted that there are woods on both sides of the pasture on the Butler Property. When asked if the cows went there instead of on to the ridge in the Disputed Area she stated: "They like the woods." When questioned, Ms. Butler admitted that she never paid much attention to see if the cows were going on to the ridge in the Disputed Area. She further admitted that it has been about 20 years since she has gone to the old fence. Ms. Butler testified that she and her husband cut timber once, but admitted that this was done in the woods close to the pasture, and was done only one time.

Walter E. Butler, Beulah Butler's son, testified at trial. Mr. Butler was 63 years old at the time of trial. He was born on the Butler Property and has lived there his entire life except for four years while he was in the military, and a year or a year and a half when he lived elsewhere. Mr. Butler testified that he understood that the fence was the boundary line. He helped his father maintain the fence. Mr. Butler stated that the cattle "roamed the whole farm," and would go up to the fence on a regular basis. He admitted, however, that the cows prefer the grasses in the pastures to the acorns and leaves in the woods. When asked, Mr. Butler stated that as far as he knows timber was cut only one time.

Noel Fletcher Marsh testified at trial. Mr. Marsh was 64 years old at the time of the trial, and grew up in the community. Mr. Wilson allowed Mr. Marsh's father to coon hunt on the Wilson Property. Mr. Marsh testified that he and his father also coon hunted on the Butler Property. When asked about the fence, Mr. Marsh stated: "That was a boundary." He stated:

> I was just told by daddy and then when the dogs would run a coon up over the hill. We could go either side because daddy and Warren was friends. So if a coon went to the other side of the fence, we went over there. And just

depending on which side we parked on to hunt on.

Mr. Marsh stated that he has seen the Butler cattle up near the fence eating acorns when he has hunted during deer season. Mr. Marsh believes the fence is the boundary because Mr. Butler told him so. Mr. Marsh thinks the fence was built by the Wilsons and stated: "The reason I think it was installed, yes, by the Wilsons is because it runs all the way through. It's the same type of old woven wire." Mr. Marsh never has seen cultivation or water troughs in the woods.

Jim Rogers also grew up in the community and testified at trial. Mr. Rogers was 55 years old at the time of the trial. Mr. Rogers testified that the reputation in the community was that the fence was the boundary line. Mr. Rogers testified that Mr. Wilson had a conversation with Mr. Rogers's father while the two were standing on a road approximately 3,000 feet away from the ridge in the Disputed Area, and that Mr. Wilson "said going through that way plumb to the lake is the line follow that fence.… He said the fence. Follow the fence was the property line." Mr. Rogers testified that his father later told him what Mr. Wilson had said. When asked, Mr. Rogers admitted that he has not been in the area of the fence for approximately 35 years, since he was a teenager.

Judy Butler, one of Beulah Butler's daughters, testified at trial. Judy Butler grew up on the Butler Property and, at the time of trial, she lived there with her mother. Judy Butler lived in Knoxville for almost 33 years before moving back in with her mother. Judy Butler testified that her family and the neighbors recognized the fence as the boundary line. She stated that the property up to the fence was used for cattle grazing, some timber cutting, and allowing people to cut firewood and hunt.

Carolyn Butler Johnson, another of Beulah Butler's daughters, testified at trial. Ms. Johnson grew up on the Butler Property. At the time of trial, Ms. Johnson lived on the Butler Property on a half acre next to her mother's house. When asked how the Butler Property was used, Ms. Johnson stated:

> We run a dairy farm, we'd milk cows, and we would have - - we would cut hay, we raised tobacco, we raised gardens. And a lot of times like, you know, the cows would go up on the hill back in there and graze.… Back on the backside. They like - - they had acorns they ate. You would have to go hunt them when they'd get lost and stuff.

Ms. Johnson testified that she helped her father maintain the fence. When asked if the terrain was too steep for the cows, Ms. Johnson stated: "Them cows got anywhere they wanted to go." She also testified that her father allowed people to cut wood on the Butler Property.

When questioned further, Ms. Johnson admitted that several of the activities that she testified about using the Butler Property for such as cutting hay, raising tobacco, and raising a garden were done down near the house, not in the Disputed Area.

The Trial Court entered its final order on October 7, 2010 finding and holding, *inter alia*:

1.  That the common boundary line between the property of the Plaintiff Richard L. Hollow, Trustee, and the property of the Defendant Beulah Butler is, and is hereby declared to be, as shown on a survey dated 09/17/03 by James Ogle ….

2.  That the Plaintiff and his predecessors in title have superior title to the disputed property lying east and southeast of the common boundary line as found by the Court.

3.   That the Defendant Beulah Butler has not established adverse possession to the property lying east and southeast of the common boundary line of the parties as found by the Court nor has she established her other defenses of laches or gross laches.

Ms. Butler appeals to this Court.

## Discussion

Although not stated exactly as such, Ms. Butler raises three issues on appeal: 1) whether the Trial Court erred in finding and holding that the boundary line was as located in the 2003 Ogle survey; 2) whether the Trial Court erred in finding and holding that Ms. Butler failed to prove adverse possession by clear and convincing evidence; and, 3) whether the Trial Court erred in finding and holding that the defenses of laches and gross laches were not proven by Ms. Butler.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). "In order for the evidence to preponderate against the trial court's findings of fact, the evidence must support another finding of fact with greater convincing effect." *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006).

We first consider whether the Trial Court erred in finding and holding that the boundary line was as located in the 2003 Ogle survey. In her brief on appeal, Ms. Butler criticizes the 2003 survey and questions why Plaintiff and the Johnson Bend Properties members never attempted to survey the boundary of the land claimed by Ms. Butler via the deeds to her and her husband to determine if Ms. Butler has the acreage called for in those deeds.

First, although Ms. Butler criticizes the manner in which Mr. Ogle approached surveying the Wilson Property, she produced no evidence whatsoever at trial that Mr. Ogle failed to follow industry standards when he prepared his survey or that Mr. Ogle made any error in his survey. In her brief on appeal, Ms. Butler argues that the 1941 deed to Wilson and her 1946 deed from the Bryants contain calls that show "that the Wilson/Butler lines join in a boundary." She then asserts: "Since the lines bear similar compass bearings and distances, it is not understood why the surveyor hired by [Plaintiff] (Ogle) could not have 'tied in' those lines by following the bearings and distances as stated in the two deeds, rather than walking through the woods numerous times looking for rock piles."

"[I]n *Thornburg v. Chase*, 606 S.W.2d 672, 675 (Tenn. Ct. App. 1980), this Court stated that '[i]n determining disputed boundaries, resort is to be had first to natural objects or landmarks, because of their very permanent character; next, to artificial monuments or marks, then to the boundary lines of adjacent landowners, and then to courses and distances.'" *Wood v. Starko*, 197 S.W.3d 255, 258 (Tenn. Ct. App. 2006). The evidence shows that Mr. Ogle searched for artificial monuments prior to resorting to the boundary lines of adjacent landowners or courses and distances. As such, we do not agree with Ms. Butler's assertion that Mr. Ogle should have surveyed the land by "following the bearings and distances as stated in the two deeds,…" rather than what he actually did.

Second, Plaintiff produced a survey of the Wilson Property, and Mr. Ogle, the surveyor who prepared the survey, testified that the survey compares almost exactly to the tax map, the TVA map, and the relevant deeds. If Ms. Butler wished to have her property surveyed for purposes of this lawsuit, she had the right to do so. Clearly, she chose not to do so, or at least did not produce any such survey at trial.

Plaintiff does not bear the burden of proving Ms. Butler's claims. Ms. Butler did not produce a survey, and the evidence shows that Mr. Ogle's 2003 survey which was introduced at trial compares almost exactly to the tax maps, the TVA map, and the relevant deeds. The evidence does not preponderate against the Trial Court's finding that the common boundary line is as shown on the 2003 survey as the evidence does not "support another finding of fact with greater convincing effect." *Wood*, 197 S.W.3d at 257.

-11-

We next consider whether the Trial Court erred in finding and holding that Ms. Butler failed to prove adverse possession by clear and convincing evidence. Our Supreme Court has instructed:

> In order to establish adverse possession under [the common law] theory, or in any statutorily based claim, the possession must have been exclusive, actual, adverse, continuous, open, and notorious for the requisite period of time. *Hightower v. Pendergrass*, 662 S.W.2d 932, 935 n.2 (Tenn. 1983); *cf. Menefee v. Davidson County*, 195 Tenn. 547, 260 S.W.2d 283, 285 (Tenn. 1953). Adverse possession is, of course, a question of fact. *Wilson v. Price*, 195 S.W.3d 661, 666 (Tenn. Ct. App. 2005). The burden of proof is on the individual claiming ownership by adverse possession and the quality of the evidence must be clear and convincing. *O'Brien v. Waggoner*, 20 Tenn. App. 145, 96 S.W.2d 170, 176 (Tenn. Ct. App. 1936). The actual owner must either have knowledge of the adverse possession, or the possession must be so open and notorious to imply a presumption of that fact. *Kirkman v. Brown*, 93 Tenn. 476, 27 S.W. 709, 710 (Tenn. 1894). When an adverse possessor holds the land for a period of twenty years, even absent any assurance or color of title, the title vests in that possessor. *Cooke v. Smith*, 721 S.W.2d 251, 255-56 (Tenn. Ct. App. 1986).

*Cumulus Broad., Inc. v. Shim*, 226 S.W.3d 366, 377 (Tenn. 2007).

Ms. Butler argues in her brief on appeal that "[t]here is no evidence whatever of use by Wilsons of the disputed strip during the entire 58 years (1948-2006), other than checking the disputed fence …." The Wilsons owned the property and as such, they had the right to use, or not use, their property as they saw fit. The burden is not on Plaintiff to show that his predecessors in title, the Wilsons, used the Disputed Area, which, as discussed above, they owned. Rather, the burden is on Ms. Butler to show her adverse possession by clear and convincing evidence.

Ms. Butler attempted to show adverse possession through the acts of her cattle straying into the Disputed Area, allowing neighbors to hunt, occasional cutting of firewood, repairing of the fence in the Disputed Area, and one incident of cutting timber. As this Court has stated: "Occasional use of land through cultivation, cutting grass or timber or the grazing of stock is not sufficient to establish adverse possession." *Cusick v. Cutshaw*, 237 S.W.2d 563, 567 (Tenn. Ct. App. 1948). *See also Quarles v. Smith*, No. W2009-00514-COA-R3-CV, 2010 Tenn. App. LEXIS 136, at *13 (Tenn. Ct. App. Feb. 24, 2010) (quoting other cases wherein it was stated: "[o]ccasional grazing and cultivation are insufficient to establish adverse possession[,]" and "occasional use of land by cutting trees, no matter how long, will

not *alone* constitute adverse possession." (citations omitted) (emphasis in original)), *no appl. perm. appeal filed*. "Actions such as the taking of firewood and hunting are more indicative of an intent to trespass than an intent to seize and hold the land." *Heaton v. Steffen*, No. E2008-01564-COA-R3-CV, 2009 Tenn. App. LEXIS 574, at *15 (Tenn. Ct. App. Aug. 27, 2009), *no appl. perm. appeal filed*.

Furthermore, none of these activities were sufficient to put the owners of the Disputed Area, i.e., first the Wilsons, and later Johnson Bend Properties and then Plaintiff, on notice that the Butlers were claiming the Disputed Area as their own. The record reveals that neither the Wilsons, nor Johnson Bend Properties, nor Plaintiff had actual knowledge that the Butlers were claiming the Disputed Area. The evidence shows that the Wilsons, the partners of Johnson Bend Properties, and Plaintiff never saw any cows in the Disputed Area. Nor did they see any other evidence of any use of the Disputed Area, much less any use sufficient to give them knowledge that someone else was making a claim to the Disputed Area. As such, Ms. Butler had to show by clear and convincing evidence that her alleged possession of the Disputed Area was so open and notorious as to imply a presumption of the fact.

Ms. Butler argues that her family's occasional repairs of the fence in the Disputed Area were sufficient to put the Wilsons on notice that the Butlers were claiming the land. The evidence in the record on appeal, however, shows that the Wilsons leased their land and that their lessees had the obligation to establish and repair fences as needed. Thus, even if the Wilsons saw repairs made to the fence in the Disputed Area, they had no reason to believe that the Butlers were making such repairs, and every reason to believe that their own lessees were making the repairs consistent with the lease agreement. As such, the repairs to the fence in the Disputed Area were insufficient to give the Wilsons notice that the Butlers were claiming the land.

The record supports the Trial Court's findings that Ms. Butler did not prove by clear and convincing evidence that her alleged possession of the Disputed Area was exclusive, actual, adverse, continuous, open, and notorious for the requisite period of time. Instead, the record shows one instance of cutting timber, occasional straying of cows into the Disputed Area, and occasional use by neighbors for cutting firewood or hunting. Further, the evidence shows that some of the hunters had permission from the Wilsons to hunt on the Wilson Property in addition to the permission given by the Butlers. Given all this, we find no error in the Trial Court's decision that Ms. Butler failed to prove adverse possession by clear and convincing evidence.

Finally, we consider whether the Trial Court erred in finding and holding that the defenses of laches and gross laches were not proven. As Plaintiff and his predecessors

in title neither had knowledge of the alleged possession nor was the alleged possession so open and notorious as to imply a presumption of the fact, Plaintiff cannot be said to have slept on his rights. We find no error in the Trial Court's conclusion that laches and gross laches were not proven.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellant, Beulah Butler, and her surety.

_____
D. MICHAEL SWINEY, JUDGE