# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs October 15, 2013

## DAVID L. TRANTHAM BY BETTY J. WARD HARTSELL, as his attorney in fact V. EVELYN NIX LYNN

**Appeal from the Chancery Court for Loudon County**
**No. 11027    Hon. Frank V. Williams, III, Chancellor**

_____

**No. E2011-02611-COA-R3-CV-FILED-MARCH 11, 2014**

_____

This is a boundary line dispute based upon competing surveys. Plaintiff brought a declaratory judgment action against Defendant, seeking to have the boundary line declared. Following a hearing, the trial court awarded the property to Plaintiff and assessed damages against Defendant for damage caused to a bridge located on Plaintiff's property. Defendant appeals. We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and THOMAS R. FRIERSON, II, J., joined.

Kent L. Booher, Harriman, Tennessee, for the appellant, Evelyn Nix Lynn.

Gary L. Fox, Lenoir City, Tennessee, for the appellee, David L. Trantham by Betty J. Ward Hartsell, as his attorney in fact.

# OPINION

## I. BACKGROUND

For ease of reference only, the county tax assessor's map depicts the properties in dispute as follows:



Huntsville Hollow Road ran perpendicular to the properties at issue, namely Parcels 31, 32, 33, and 34, while a railroad track also ran parallel to Parcels 31, 33, and 34. Raymon G. Almanza owned Parcel 31, David Lynn Trantham ("Plaintiff") owned Parcel 33, and Evelyn Nix Lynn ("Defendant") owned Parcels 32 and 34. Plaintiff and Defendant (collectively "the Parties") are cousins. Defendant received Parcel 32 from her family, the Nixes, while Plaintiff received Parcel 33 from his family, the Galyons. In 2010, Defendant purchased Parcel 34 at a tax sale.

Plaintiff's sister, Betty Jane Hartsell, filed suit on behalf of Plaintiff to ascertain the location of a small area of property between Parcels 32 and 34 and to ascertain the line of demarcation between Parcels 33 and 34. The Parties asserted ownership over a bridge located on the disputed area between Parcels 32 and 34 and claimed that the other party simply held an easement. Plaintiff also claimed that Defendant encroached upon Parcel 33 by moving a fence that ran between Parcels 33 and 34. The Parties hired surveyors to

establish the boundary line at issue.. The surveyors unsurprisingly sided with their respective clients. A third-party complaint was filed against Mr. Almanza and his wife, the owners of Parcel 31, to set the boundary line between Parcels 31 and 33. The Almanzas chose not to contest the complaint and accept the boundary line as found by Plaintiff's surveyor.

A bench trial was held at which several witnesses testified. Ms. Hartsell testified that she was born in January 1946 and lived on Parcel 33 with her family when she was a child. She related that two bridges crossed a large ditch between Parcels 32 and 33 and that one bridge ("the Galyon Bridge") provided access to her grandmother's house, while the other bridge ("the Tinnell Bridge") provided access to the Tinnell family's house that was located on what is now referred to as Parcel 34. The Tinnells were also relatives. She recalled that three to four feet separated the bridges and that she and her relatives could easily jump from one bridge to the other. She claimed that the Tinnell Bridge was eventually dismantled when the Tinnell home was destroyed by fire but that the Galyon Bridge had been in the same location for approximately 100 years.

Ms. Hartsell identified a picture taken in the late 1950s in which a young child was riding a bike on the Galyon Bridge. She stated that the fence, which can be seen in the background of the picture, represented the original fence line surrounding what is now referred to as Parcel 32. In the picture, the fence ran from Huntsville Hollow Road to just before the bridge. The fence left little room between Parcel 32 and the driveway leading to the Galyon Bridge. She claimed that visitors parked inside the fence line when visiting the occupants of Parcel 32. She identified a more recent picture that depicted landscaping timbers in place of the initial fence line. She related that the timbers were placed along the original fence line but that Defendant and her guests parked in the driveway that was intended to be used as an access route to the Galyon Bridge. She stated that Defendant and her guests also used the Galyon Bridge to access Parcel 34 and that their continual use of the Galyon Bridge caused damage to Plaintiff's property. She related that Defendant had plenty of room to build her own bridge, just like the Tinnell Bridge. Ms. Hartsell claimed that the disputed property had always been referred to as Plaintiff's property until May 26, 2006, when she and Plaintiff were replacing poles and boards on the Galyon Bridge. She said that Defendant confronted her about the use of the bridge and that the confrontations continued until she filed suit.

Relative to the other area in dispute, Ms. Hartsell claimed that Defendant moved a fence that had separated Parcel 33 from Parcel 34 when Defendant purchased Parcel 34 in 2010. She claimed that the original fence was placed in reliance upon a survey performed by Harry A. Fraser.

Otis Tinnell testified that he and his family lived on a portion of the property described as Parcel 34 when he was a child. He recalled that the Pettys lived on the property abutting Huntsville Hollow Road, while he and his family lived on the other side of the ditch beside the Galyons. He related that the Tinnell Bridge was built in the early 1950s and was subsequently dismantled in the 1960s after he and his family left the area when their home was destroyed by fire. He claimed that the property owned by Plaintiff was always considered Galyon property and was never known as belonging to the Nixes. He related that in 2006, he helped resurface the Galyon Bridge, along with Defendant's husband, George Otis Lynn and other relatives.

Jack Tinnell, Otis Tinnell's brother, confirmed the property locations before the fire. He recalled that the fence line depicted in the picture of the little girl on the Galyon Bridge properly illustrated the line of demarcation between Defendant's property and the driveway for the Galyons. He related that the property in issue had always been considered Galyon property. He claimed that he was also present when the Galyon Bridge was resurfaced in 2006.

Ms. Hartsell's husband, Bob Hartsell, testified that he and Ms. Hartsell began dating in 2001 and were married in 2003. He insisted that the property in dispute had always been referred to as Galyon property until 2006. He claimed that since that time, Defendant and her family purposefully damaged the Galyon Bridge and surrounding property.

William Leggins, a licensed engineer and surveyor, testified that he surveyed the property in 2006. In his inspection of the property, he found a woven wire fence and several iron pins that served to delineate the proper boundary lines between the properties. He also utilized the deeds for each property, two prior surveys completed by Mr. Fraser, the natural boundary of a drainage ditch, and the existing railroad right-of-way that ran through Parcels 31, 33, and 34. He submitted a survey based upon his findings that vaguely resembled the outline provided by the county's map, which was reflected at the beginning of this opinion. The written portion of his survey read, in pertinent part, as follows:

Special Note:

It is the recommendation by this surveyor, based upon inconsistencies and vagueness of deeds, the boundaries for Parcels 32, 33, & 34, (properties on Map 026-G, Group 'A') should be resolved as follows:

1. Parcel 032.00 should have 156 feet of road frontage per deed (Trantham's chain of title states a 50 x 75 exemption), extend the side property lines back

to the center of a very large drainage ditch, then allow the back of the two side lines be joined with the meanders of said ditch.

2. Parcel 034 should have a road frontage of approximately 130 feet; extend the two side lines straight back to the railroad right-of-way. (The first time [Fraser] surveyed Parcel 034 from deed 214 / 789; the deed only had 77.5 feet on the back line, how the other was not included is not understood).

3. Parcel 033 should be in accordance with the survey as shown hereon. That is, start at an existing, galvanized pipe at the northwest corner of Parcel 034, leave the road run with one straight line with Parcel 034 back to the railroad right-of-way to an existing iron rod; then run with one straight line with Parcels 031 & 033 to a point in the center of the above mentioned large ditch; then run with the meanders of the centerline of said ditch to the southeast corner of Parcel 032 as shown in this survey plat; then leave the ditch and run with the newly created line between Parcels 032 and 033 as shown hereon to the south margin of Huntsville Hollow Road; and then run with the margin of said road to the Point of Beginning.

4. Additionally, it should be noted that a portion of Parcel 033 that extends from the creek and extends to Huntsville Hollow Road (including the new bridge) will become a 'fee simple' part of Parcel 033.

He vehemently disagreed with a survey performed by James Cross in which Mr. Cross asserted that Plaintiff was required to access his property by use of a small piece of land between Parcels 31 and 32. He related that the property meandered through a "deep ditch area" that was already maintained by Defendant. He also disagreed with Mr. Cross's belief that Parcel 32 abutted Parcel 34, leaving no room for Plaintiff to access Parcel 33 by way of the Galyon Bridge that had been in use for the that purpose for at least 50 years. He further claimed that the deed for Defendant's purchase of Parcel 34 relied upon the description provided by Mr. Fraser. He stated that despite that fact, Mr. Cross insisted that the boundary for Parcel 34 extended well beyond the line set by Mr. Fraser. He conceded that based upon his research, he set his own iron spike as a corner for Defendant's property instead of one that was already in the ground.

Mr. Fraser, a licensed surveyor, testified that he performed a survey of the property in 2001 for Defendant. He claimed that there was a disagreement between he and Defendant "about where [he] put the property versus where [she] thought it ought to be." He related that his survey lines of the Galyon Bridge coordinated with Mr. Leggins's survey "for the most part." He also surveyed the area in 1997 to find the boundaries for Parcel 34.

Mr. Cross, a licensed land surveyor, testified that in preparation for surveying the property, he researched the properties involved, the respective deeds, and the physical evidence found on each property. He identified several deeds that were relevant to his final survey of the property, namely the deed that served to transfer Parcel 32 from the Galyons to Ruth Nix, Defendant's mother, on March 17, 1947, the deed that served to transfer Parcel 32 from Ruth Nix to Defendant on December 23, 1975, and the deed that served to transfer Parcel 33 from Salusta Galyon to Margie Galyon Trantham on September 15, 1961.

The deeds for each transfer were as follows:

| Year | Grantor | Grantee | Description |
|---|---|---|---|
| 1947 | Galyons | Ruth Nix | Beginning on an iron pin or stake in the [old road] and running thence in a Southeasterly direction with the [Rudd line] for a distance of 50 feet to the edge of the creek or ditch; thence with the ditch line in a general Westerly direction for a distance of approximately 156 feet; thence in a general Northerly or Northeasterly direction back to the edge of [the old road] it being a distance of 40 feet; thence with the edge of said [old road] in a general Easterly direction for a distance of 156 feet to the place of beginning. |
| 1961 | S. Galyon | M. Trantham | Being bounded on the South side of the Lenoir Loudon Road and extending back at right angles in a southerly direction to the property of the Southern Railway right of way and bounded on the East by the lands of Nichols (Arp) and bounded on the West by the lands of Rudd, containing approximately one (1) acre of land in said boundary.<br><br>However, there is excepted from the above real estate a strip of property that was conveyed to Ruth Nix which is 50 feet wide and approximately 75 feet in depth on the North side of the herein described boundary of land . . . . |
| 1975 | Ruth Nix | Defendant | Beginning on an iron pin or stake in [old road] and running thence in a southeasterly direction with the [Rudd line] for a distance of 50 feet to the edge of the creek or ditch; thence with the ditch line in a general westerly direction for a distance of approximately 156 feet; thence in a general northerly or northeasterly direction back to the edge of the [old road]; it being a distance of 40 feet; thence with the edge of the said [old road] in a general Easterly direction for a distance of 156 feet to the place of beginning. |

Mr. Cross testified that there was a slight mistake in the 1961 deed concerning the description of the Nix property, which was excepted from the transfer as a 50 x 75 feet parcel of land. He stated that the "50 x 75 parcel of land was assumed to be around what is the Lynn/Nix house, as it exists now." His survey reflected that Parcel 32 was bounded by Huntsville Hollow Road, Parcel 34, and Parcel 33. He believed that a small strip of land that belonged to Plaintiff separated Parcel 32 from Parcel 31. He claimed that while Plaintiff was free to use that land to access Parcel 33, the land was simply "a fee simple strip of land that [was] left over from the legal description." He stated that it was Plaintiff's prerogative to use that land to access Parcel 33 because Plaintiff also held an express easement on Parcel 34. He asserted that his final survey of Parcel 32 properly reflected the deeds for each property but that the surveys completed by Mr. Leggins and Mr. Fraser failed to account for the property descriptions in the deeds, namely they refused to acknowledge what was referred to in the deeds as the Rudd line. He insisted that the county tax map was simply erroneous.

Relative to the second area of contention, the line of demarcation between Parcels 33 and 34, Mr. Cross denied ever observing a fence line through the two properties. He further stated, "In all of my surveying training for the past 20 years, not once has it ever been mentioned that a fence line constitutes possession." He conceded that he had yet to set the property corners based upon his survey but insisted that he had "plenty of time to set those corners" because of the "four year statute of limitations on that survey."

George Lynn testified that he married Defendant in 1963. He was familiar with the property and denied any knowledge of two bridges in that area. He claimed that Plaintiff moved the Galyon Bridge at least ten feet in the late 1990s and that the Galyon Bridge had always encroached upon Defendant's property. He asserted that he and his family parked in the area in dispute "[a]ll the time." He acknowledged that he provided minimal assistance when Ms. Hartsell and her family resurfaced the Galyon Bridge in 2006 because he was unaware of the issues between his wife and Plaintiff's family. He related that when Defendant returned, she called the police department to report Ms. Hartsell's actions. He insisted that despite their dissatisfaction with the placement of the Galyon Bridge, he and his family had not caused any damage to the Galyon Bridge.

George Lynn admitted that he objected to Mr. Fraser's survey of the property and that he never submitted payment for the survey because Mr. Fraser refused to "straighten this mess out." He acknowledged that three other surveyors visited the property and that they left "[b]ecause there was a problem." He admitted that Parcel 32 "was supposed to" abut Parcel 31 and that Mr. Cross's survey did not reflect that fact. Relative to the second area of dispute, the boundary between Parcel 34 and Parcel 33, he acknowledged that he tore down

a fence and built a new fence. He admitted that according to Mr. Fraser's survey and the deed he received when he purchased the property, his new fence encroached upon Parcel 33.

Defendant testified that Plaintiff moved the Galyon Bridge onto her property and also subsequently widened the bridge, causing it to encroach even further onto her property. She acknowledged that Mr. Fraser could not complete his survey while she was present because she told him to leave her property. She claimed that his final survey was "a lie." Relative to Mr. Cross's survey, she asserted that she maintained the portion of property between Parcels 31 and 32 because Plaintiff "wouldn't do nothing" in that area.

Carolyn Nix, Lisa Worley, and Floyd Timothy Nix all testified on behalf of Defendant. They asserted that Plaintiff moved the Galyon Bridge onto Defendant's property. They denied any personal knowledge of the Tinnell Bridge, but they also acknowledged that they were not present when the Tinnells lived in the area. Mr. Nix further asserted that Ms. Hartsell told him that she had the ability to obtain Defendant's property through the use of an old deed.

Following the presentation of the above evidence, the trial court held that in 2010, Defendant took land that she did not receive when she purchased Parcel 34. The court set the line between Parcels 33 and 34 as found by Mr. Fraser, thereby awarding Plaintiff property that had previously been encroached upon by Defendant. Relative to the ownership of the land surrounding the Galyon Bridge, the court noted that there was a presumption in favor of Plaintiff because taxes had, at the very least, been assessed against Plaintiff for the property. The court accepted Mr. Leggins's survey and found that despite testimony to the contrary, the greater weight of the evidence showed that the Tinnell Bridge existed. The court held that in considering the survey, the submitted pictures, and the tax assessor's map, the greater weight of the evidence showed that Plaintiff owned the disputed property, while Defendant only held an easement. The court instructed Defendant to build her own bridge to access her newly purchased property and assessed damages against her for the destruction of the Galyon Bridge. Plaintiff filed a motion to alter or amend the final judgment regarding the placement of any new bridges but later withdrew the motion after realizing the grant of that motion would delay an appeal. This timely appeal followed.

## II. ISSUE

We restate the issue raised on appeal as follows:

Whether the trial court correctly found the boundary lines between the Parties.


## III. STANDARD OF REVIEW

This case was tried by the court without a jury. Therefore, our review of the trial court's decision is de novo with a presumption of correctness as to the trial court's findings of fact, unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2000). For evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001); *Walker v. Sidney Gilreath & Assoc.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000). A trial court's conclusions of law are subject to de novo review with no presumption of correctness. *See Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993)

"In determining disputed boundaries, resort is to be had first to natural objects or landmarks, because of their very permanent character; next, to artificial monuments or marks, then to the boundary lines of adjacent landowners, and then to courses and distances." *Thornburg v. Chase*, 606 S.W.2d 672, 675 (Tenn. Ct. App. 1980) (citations omitted). The issue of where the boundary called for in the deeds is located on the surface of the earth is a question of fact. *See* 12 Am.Jur.2d Boundaries § 121 (1997). "In resolving a boundary line dispute, it is the role of the trier of fact to evaluate all the evidence and assess the credibility of the witnesses." *Mix v. Miller*, 27 S.W.3d 508, 514 (Tenn. Ct. App. 1999) (citing *Norman v. Hoyt*, 667 S.W.2d 88, 91 (Tenn. Ct. App. 1983)). The trial court is in a better position than we are to observe the demeanor of the witnesses and evaluate their credibility. Thus, we will give great weight to a trial court's credibility determinations. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997). That same deference extends to a trial court's decision between competing surveys. *See Mix*, 27 S.W.3d at 514.


## IV. DISCUSSION

Defendant argues that the trial court made numerous errors in setting the boundary lines between the properties at issue. Defendant claims that the court placed too much weight on the existence of a fence placed in the 1990s, on a photograph from the 1950s, on the purported existence of the Tinnell Bridge, and on Mr. Leggins's survey, which was

"adjusted to fit the best interest[] of the parties." Defendant also claims that the trial court erroneously relied upon the tax map, which she asserts was not admitted into evidence, and misapplied the statutory tax presumption, codified at Tennessee Code Annotated section 28-2-109. Plaintiff responds that the court's decision was supported by the evidence.

Relative to the court's use of the tax map, the court was hesitant to admit Mr. Leggins's enlarged aerial photograph of the map, but the court ultimately admitted the document, holding that it was not admitted to prove the location of the lines but only as a frame of reference for Mr. Leggins. Additionally, the court admitted the actual tax map into evidence *without objection* during Mr. Cross's testimony. The court also never applied the statutory tax presumption as alleged by Defendant. On the contrary, the court stated,

> [T]he property assessor has shown this for many, many, many years apparently, [] as being the property of [Plaintiff]. And that creates a presumption in favor of [Plaintiff], for those who have been paying taxes on it.
>
> And we have scanned the evidence; there is no evidence of actual payment, but we do have evidence that it has been assessed to them as part of the tax maps that were introduced.

The relevant code section provides,

> Any person holding any real estate or land of any kind, or any legal or equitable interest therein, who has paid, or who and those through whom such person claims have paid, the state and county taxes on the same for more then twenty (20) years continuously prior to the date when any question arises in any of the courts of this state concerning the same, and who has had or who and those through whom such person claims have had, such person's deed, conveyance, grant or other assurance of title recorded in the register's office of the county in which the land lies, for such period of more than twenty (20) years, shall be presumed prima facie to be the legal owner of such land.

Tenn. Code Ann. § 28-2-109. While the trial court placed some weight on the tax map, the court acknowledged that the record was devoid of any proof that Plaintiff paid taxes on the disputed property. Moreover, the record reflects that in addition to the tax map, the court considered the entirety of the evidence in making its decision.

The testimony and the evidence was conflicting, at best. Mr. Cross relied almost exclusively on the boundary lines of the surrounding properties as described in the pertinent

deeds. While Parcel 33 was a bounded deed, there were several natural objects or landmarks and artificial monuments or marks that should have been considered before Mr. Cross focused upon the boundary lines of adjacent landowners and the courses and distances found in the deeds. Mr. Leggins was also not without fault given the fact that he ignored some of the previously placed markers. The case essentially hinged upon which of the two surveys the trial court credited. In consideration of the trial court's deference in such cases, we conclude that the evidence does not preponderate against the determination of the trial court as to the placement of the boundary lines between the Parties. Accordingly, we affirm the decision of the trial court.

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Evelyn Nix Lynn.

_____
JOHN W. McCLARTY, JUDGE