IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 4, 2019 Session

**KENNETH A. WEBER ET AL. v. HAROLD W. KROEGER ET AL.**

**Appeal from the Chancery Court for Davidson County**
**No. 16-1151-II      Anne C. Martin, Chancellor**

_____

**No. M2019-00406-COA-R3-CV**

_____

Two adjoining property owners disputed their shared boundary line. The contractor who renovated the houses on each of the parcels owned both properties before selling them to the parties, and he erected a privacy fence where he thought the property line was located. A survey conducted years after the parties had purchased the properties placed the boundary line in a somewhat different location than the location of the privacy fence. When one of the property owners began dismantling the fence in an effort to utilize the property that the survey showed belonged to them, the neighboring owners obtained a temporary restraining order to maintain the status quo and filed a declaratory judgment complaint to determine the boundary line. The trial court entered a judgment declaring that the privacy fence was the boundary line and that the parties jointly owned the fence. On appeal, we affirm the trial court's ruling declaring the location of the boundary line, but we reverse the ruling that the fence is jointly owned.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part, and Vacated in Part**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which W. NEAL MCBRAYER and ARNOLD B. GOLDIN, JJ., joined.

Hilary Claire Dennen and Alvin Scott Derrick, Nashville, Tennessee, for the appellants, Harold W. Kroeger, Mary Kay Kroeger, and The Kroeger Family Trust Dated October 26, 2018.

Kenneth A. Weber, Nashville, Tennessee, for the appellee Shelley E. Munroe, and pro se.[1]

_____

[1] Mr. Weber is an attorney and is therefore able to represent Ms. Munroe.

# OPINION

## I. FACTUAL AND PROCEDURAL BACKGROUND

The two parcels of land at issue in this case were initially part of a larger tract that was divided into a northern property (2405 Oakland Avenue) and a southern property (2407 Oakland Avenue). Both parties purchased their respective lots from Robert Brady Fry, who renovated the houses situated thereon. Mr. Fry purchased 2407 Oakland Avenue ("2407") on April 9, 2003, and he purchased the adjoining property to the north, 2405 Oakland Avenue ("2405"), on May 20, 2004. Mr. Fry renovated 2405 and sold it to Harold W. and Mary Kay Kroeger ("the Defendants") on May 16, 2005.[2]

The Defendants' deed describes their property as follows:

> LAND in Davidson County, Tennessee, being the northerly half of Lot Number 167 on the Plan of Belmont Land Company's Plan of Lots called Belmont Heights, of record in Plat Book 421, page 34, Register's Office for Davidson County, Tennessee, to which plan reference is hereby made for a more complete description.
>
> BEING the same property conveyed to Robert Brady Fry by deed from Brennan Chad Brown, an unmarried person, of record as Instrument No. 200405210059958, Register's Office for Davidson County, Tennessee.
>
> THIS CONVEYANCE IS SUBJECT TO: (1) Taxes which have been prorated and assumed by Grantee; (2) All restrictions of record; (3) All easements of record; (4) All visible easements; (5) All matters appearing on the plan of record; (6) All applicable governmental and zoning regulations.

The Defendants and Mr. Fry executed an addendum to their purchase and sale agreement ("the Addendum") providing that $5,000 of the purchase price would be held in escrow until Mr. Fry (1) erected a privacy fence between 2405 and 2407 and (2) installed gutters and downspouts on the house. The language regarding the privacy fence is as follows:

> Privacy fence to the rear of property and between 2405 and 2407 Oakland Avenue. Fence to the North side of property to be completed in coordination with completion of grading with owners of 2403 Oakland

---

[2]The Kroeger Family Trust Dated October 26, 2018, is also a defendant, but it has no bearing on the proceedings.

Ave. Seller agrees to complete this portion of the fence within 30 days of notice from buyers.[3]

Mr. Fry sold 2407 to Kenneth Weber and Shelley Munroe ("the Plaintiffs") on July 27, 2006. The Plaintiffs' deed describes their property as follows:

Land in Davidson County, Tennessee, being the south half of Lot number 167 on the Map of Belmont Land Company's plan of record in Book 421, page 34, Register's Office for Davidson County, Tennessee.

Said part of Lot number 167 fronts 50 feet on the westerly side of Oakland Avenue and runs back between parallel lines 175 feet to an alley.

Being the same property conveyed to Robert Brady Frye (sic) by deed of record as instrument 20030414-0049351, said Register's Office. The said Robert Brady Frye is also known as Robert Brady Fry. His spouse, Sharma Fry, joins in this conveyance.

THIS CONVEYANCE IS SUBJECT TO: (1) Taxes which have been prorated and assumed by Grantee; (2) All restrictions of record: (3) All easements of record; (4) All visible easements; (5) All matters appearing on the plan of record: (6) All applicable governmental and zoning regulations.

The parties did not question the location of their shared boundary until sometime in 2011, when the Plaintiffs had a survey done for reasons unrelated to this case. As described more fully below, the 2011 survey indicated that the boundary line did not match up with the location of the privacy fence. The Defendants had another survey done in 2016, and based on the results of that survey, the Defendants decided to take down the privacy fence and make use of the property that the survey indicated belonged to them. The Plaintiffs objected to the Defendants' removal of the fence and sought injunctive and declaratory relief to resolve the dispute.

The parties had a bench trial on November 28, 2018. The witnesses included Mr. Fry, Mr. Weber, and both defendants. Mr. Fry testified that he intended the privacy fence between 2405 and 2407 to be on the property line between the two properties and that, during the time that he lived in 2407, he considered the fence to be the boundary between 2405 and 2407. Mr. Fry explained how he decided where to place the privacy fence:

[T]he idea that a fence post - - the center of a fence will precisely be on a boundary is unlikely. . . . Belmont and Oakland, that neighborhood is

---

[3]This language shows that Mr. Fry agreed to install two privacy fences, one on the north side of 2405 and one on the south side of 2405. Only the south fence, between 2405 and 2407, is at issue in this case.

almost exclusively 50-foot by 150-foot lots. Some rare exceptions. But almost every lot including all of them on Oakland and that lot are 50 by 150. The house is set - - the setback is 5-foot off the property line. . . . Our method for laying out the fence would be a measure between the houses. They had the same setback and split that difference. That would have been our method for laying out the fence.

Mr. Fry confirmed that he and his workers followed this practice when they installed the privacy fence at issue. The Defendants were living at 2405 when the privacy fence went up, and they did not express any objections to the location of the fence.

An alley runs behind the Plaintiffs' and the Defendants' houses that is parallel to Oakland Avenue. Both parties have an area on their respective properties, contiguous to the alley, where they can park their vehicles. Mr. Fry testified that 2407 had a cement parking pad next to the alley that was there when he purchased the property in 2003. Mr. Fry believed the northern edge of the parking pad marked the northern edge of the property belonging to 2407. Mr. Fry also testified about a concrete sidewalk perpendicular to Oakland Avenue that ran along the northern edge of 2407 and to the front door of the house:

> There was a sidewalk to the front door. It kind of came up the right side of 2407 and then took a left and had a number of steps along the way to get to the - - 2407 sits probably 8 feet or possibly more above street level. So that's kind of the - - you know, the - - I guess, the approach to the home.

Mr. Fry explained that the concrete walkway was solid but did not look nice when he moved into 2407, so he placed a crab orchard stone veneer on top of the existing concrete to improve its appearance.

The privacy fence was placed between the parking pad, on the west side of 2407, and the walkway, on the east side of 2407. According to Mr. Fry, the fence lined up with the northern edge of the parking pad and also lined up with the northern edge of the walkway. When asked why he did not have a survey done of the two properties before he made the improvements, Mr. Fry responded:

> [W]e were cooperating properties in terms of we were neighbors. We were both probably equally anxious to get the fence constructed. Again, I had some knowledge about the setbacks, and I don't know that - - you know, again, that's still in some situations is how I would do it in a similar situation. I wouldn't necessarily - - if two neighbors - - you know, there's not an intention to - - a fence isn't used to reward or deprive anybody of their property, but that doesn't necessarily mean that it's a split hair down the very center of the property line either.

Mr. Fry testified that there had been a chain-link fence between the two properties at some point in the past. Although he could not say the privacy fence was placed exactly where the chain-link fence had been, he testified that he did his best to make sure the privacy fence was in line with "the preexisting structures that were there."

Mr. Fry testified that the Defendants never complained to him about the location of the privacy fence or the cement parking pad belonging to 2407. While he was living in 2407, Mr. Fry stated that he and the Defendants treated the northern edge of the walkway, the privacy fence, and the northern edge of the parking pad as the boundary line between the two properties.

Sometime in the first quarter of 2011, the Plaintiffs wanted to put up a fence between their property and the property to their south, 2409 Oakland Avenue. They arranged to have a survey done at their landscapers' suggestion. The surveyor pinned all four corners of 2407, and the pins that were placed between 2405 and 2407 did not line up with the line the Plaintiffs believed was the boundary between the properties. According to the survey, the Plaintiffs' parking pad was about eighteen inches over the line into the Defendants' property. The survey line crossed over the line where the privacy fence was located and, according to the survey, a portion of the privacy fence was about seven inches too far south of the property line, encroaching onto the Plaintiffs' property. The survey showed that the Defendants were utilizing some of the Plaintiffs' yard in the front, near Oakland Avenue. Mr. Weber testified about his surveyor's pins:

> [O]ur surveyor . . . pinned . . . the boundary with the Kroegers. At that point, obviously, I noticed where the pins were and noticed, well, gee, you know, this boundary over here with the Kroegers, if you compare it to the survey, it's off, like, you know, to, I guess, the Webers' favor in the back and to the Kroegers' favor in the front.
>
> There were all of these structures over there. The parking pad. The wall.[4] The fence line. I figured it didn't matter because, in my view, that set the historic boundary. So I never mentioned this to the Kroegers. I had no desire whatsoever. Shelley and I were satisfied with the historic boundary. So, to us, the only reason we did the survey was for the boundary on the other side. We didn't care about any survey - - what the survey said on the Kroeger side.

The Defendants met with the Plaintiffs on March 20, 2011, after the Plaintiffs' surveyor pinned the boundary between their two properties. According to Mr. Weber, the Defendants asked about the survey and why the Plaintiffs had it done. The Defendants then asked the Plaintiffs if they "had any intentions of changing the boundary between

---

[4]A retaining wall was built on the east side of the parking pad that ran perpendicular to the boundary line.

the Webers and the Kroegers." Mr. Weber testified that he assured the Defendants that he and his wife "had no such plans." Mr. Weber testified that he told the Defendants he and his wife would probably replace their parking pad at some point in the future, and they were thinking about replacing the cement with more environmentally-friendly pavers. Mr. Weber said that they may be able to replace their pad at the same time that the Defendants had work done on their backyard. Mr. Weber was clear that "[t]he Kroegers were noncommittal about what they wanted to build. They were also noncommittal about when they wanted to build it."

The Defendants remembered this conversation differently. According to Mrs. Kroeger, the parties discussed moving the boundary line to match the Plaintiffs' survey. Mrs. Kroeger testified that "we were all talking about putting it to the 2011 - - respecting that line. . . . [W]e saw it as a simple solution of resolving a mistake made by our contractor."

Mr. Kroeger agreed with his wife's recollection of the parties' conversation. He testified:

> I would agree with everything [Mrs. Kroeger] said. The only thing that I would add is when we were discussing with Mr. Weber up on that pad in 2011, and we were discussing the inconsistency between the survey and what we've now learned was the physical mistake as a result of Brady Fry's work, that the whole topic of the driveway that was going to be constructed in the future that Mr. Weber represented would be a paver driveway was in response to my comment discussing how we could in various ways leverage this foot and a half, roughly, of concrete that was his concrete, but it was on our land, and the notion that we would be investing in a water mitigation betterment-of-the-flow-of-the-watertype solution that would benefit Mr. Weber as well as it would benefit us leveraging this land.
>
> That's what prompted -- I recall that's what prompted his comment about, "well, we're going to be putting in a paver driveway," suggesting that would be a good time to do this. That's what I walked away from that conversation feeling; that we had an oral contract, if you will, to work together to resolve this issue. We were going to spend the money on this water mitigation approach, and he was going to be sacrificing, in essence, some concrete. Granted, it was on our land. But we had a meeting of the minds, an oral contract, where we met each other halfway to solve a real problem. It was all cordial. We had no reason to disbelieve that, because, in fact, he had observed his own survey on the other side. So we felt comfortable that that would be taking place.

Mr. Weber disagreed that the parties talked about moving the boundary line during their conversation on March 20, 2011. According to Mr. Weber:

> The other thing I want to make clear because the Kroegers are claiming in this case and in that conversation in 2011, they also said they wanted to adjust the boundary. Okay? I guess consistent with the survey that they saw that the Webers just had. They did not say that. They never said to me in any way, shape, or form that they wanted to adjust the boundary. They never said that they wanted to remove a part of my parking pad. If they would have said something like that, I would have objected. The parking pad was already small enough.

Mrs. Kroeger explained that although they had hoped to start building a garage in their backyard sooner, they did not begin designing the project until 2015. She testified that Mr. Kroeger informed Mr. Weber of their plans and told him it would be a good time to redo the Plaintiffs' parking pad. By this time, however, the Plaintiffs had changed their minds, and Mr. Weber told Mr. Kroeger he was "not doing the driveway." The Defendants were moving forward with their construction plans regardless of the Plaintiffs' plans, and their project manager informed them that construction could not begin until the four corners of their property were staked. As a result, the Defendants had a survey of their property performed by David Brackman in November 2016. The evidence showed that Mr. Brackman relied on the pins from the Plaintiffs' 2011 survey to mark the boundary between 2407 and 2405.

According to Mr. Weber, the Defendants did not say anything about moving the boundary line until 2016, shortly before the Defendants began their construction project. Mrs. Kroeger testified that she and her husband intended to include within their construction project the movement of the boundary line between 2405 and 2407 to conform to their survey. Mr. Weber testified that the Defendants told him they needed to adjust the property line because they believed they were entitled to make use of the property that the survey showed belonged to them. Mr. Weber testified that he responded, "No, I'm not agreeing to this."

On October 25, 2016, the Defendants' contractors began taking down the privacy fence. The contractors were unable to finish removing the fence before dark, and they told the Defendants they would take down the remainder of the fence the following day. When Mr. Weber arrived home that night and noticed the fence's partial removal, he went over to speak with the Defendants. The parties disagreed about whether the Defendants had the right to remove the privacy fence and whether the survey dictated the boundary between the properties.

A few days later, on October 28, 2016, the Plaintiffs filed a verified complaint for declaratory judgment and injunctive relief. They asked the court to declare that (1) the

boundary line between 2405 and 2407 should remain where it has been for at least the last ten years; (2) the Defendants are not permitted to move the property line unilaterally; (3) the Defendants are not permitted to remove a portion of the Plaintiffs' driveway and retaining wall because they believe they encroach on their property; and (4) the Defendants are not permitted to change the location of a common fence that divided the parties' properties for at least the past ten years. The trial court issued a temporary restraining order on November 1, 2016, and the parties entered into an agreed temporary injunction on November 14 to maintain the status quo pending a judicial resolution of the case. The Defendants answered the complaint and asserted a nuisance counterclaim against the Plaintiffs based on damages to their property resulting from the flow of water from the Plaintiffs' property onto their property. The Plaintiffs amended their complaint in August 2017 to add a claim for damages.

### Trial Court's Decision

Following the presentation of evidence, the trial court filed a Memorandum and Order on February 14, 2019. The trial court made the following relevant findings of fact, *inter alia*:

> As part of the 2005 sales agreement with the Kroegers, Mr. Fry agreed to make additional improvements to 2405 post-closing, which agreement was memorialized in an "Addendum" to their sales contract. The Addendum provided that Mr. Fry would hold $5,000 of the sales proceeds in escrow until completing the agreed upon improvements and punch list items. One such improvement was a privacy fence on both sides of the Kroeger Property. The escrowed $5,000 was not intended to represent the cost of the agreed upon improvements. It was simply a number they agreed upon to incentivize Mr. Fry to finish those items.

> Mr. Fry erected the privacy fence and installed gutters at the Kroeger Property, as provided for in the Addendum, while still living next door at 2407. The fence in between those properties was intended to benefit both, and was built in a style to match the fence on the south side of 2407, in between it and 2409 Oakland Avenue.

> When Mr. Fry purchased 2407 in April 2003, there was a chain link fence between the back yards of that property and 2405. Mr. Fry did not have the property line surveyed for the privacy fence he built because "[w]e were cooperating properties in terms of we were neighbors." He does not believe there was a material difference between where the fences were located. His intention was for it to be on the property line and square with existing structures.

- 8 -

Mr. Fry believes it is unlikely when putting up a fence that the center of the fence post will hit directly on the boundary, although his intention was to erect it on the property line between 2405 and 2407. Mr. Fry's method for locating fences in the Belmont area was not to have a survey done, but rather to use the known lot size and setback, measure between the houses, and split that difference. Almost all of the lots in the area are 50 feet by 150 feet, with a setback of 5 feet from the line. He, like other builders, measured between houses, used the same setback, split the difference and built in between. Mr. Fry considered the line where the fence was built to be the boundary between 2405 and 2407.

The Kroegers interacted with Mr. Fry and his construction crew when the privacy fence was being erected, and they were living on the Kroeger Property at the time. They did not object to where it was being placed.

At or around the same time, other fixtures on the boundary included: (i) a retaining wall and sidewalk up the right side of 2407, next to 2405, sloping up the yard to a dilapidated garage; (ii) an old block wall; (iii) a "little tail" of driveway that went from the parking pad next to the garage behind 2407 which appeared to extend onto the line of 2405[5]; and (iv) a parking pad that filled the space between the garage and the north edge of 2407.

The parking pad behind 2407 was there when Mr. Fry bought the property in 2003, and based on its poor condition, he believed it had been there for some time. He eventually poured a new parking pad directly over that old one, and built a new garage on the same pad. The 2407 garages, new and old, opened north, towards 2405, directly onto the alleyway. Metro codes did not permit Mr. Fry to change this configuration. The Kroegers did not object to the location of the parking pad behind 2407 when Mr. Fry owned it.

In addition to building a new garage and pouring a new parking pad at 2407, Mr. Fry improved the stone retaining wall that ran along the east edge of the parking pad, but did not extend its length; therefore the north edge of the improved retaining wall is located in the same place as the north edge of the old stone retaining wall that was in place when Mr. Fry purchased 2407 in April 2003.

---

[5]Mr. Fry testified that he cut off this "tail" at some point when he was renovating 2405 and 2407, and the "tail" is not in dispute in this case.

As part of his renovations to 2407, Mr. Fry also improved the front walkway along the north edge of the front yard. To do so, he placed a stone veneer on top. Based on its poor condition, he could tell that it had been there for years before his purchase.

Plaintiffs bought 2407 from Mr. Fry on July 27, 2006, and moved in soon thereafter. Their deed does not contain any language or graphics to identify where the boundary is located. They always believed the north edge of their property (the boundary with the Kroeger Property) was evidenced by the north edge of their front walkway, and that the fence made up the rest of the north boundary, all the way back to the north edge of their parking pad, which continued up to the alley.

From 2006 until 2011, the parties lived next door to each other without any issues related to the property boundary. They each mowed and landscaped on their side of the fence, and built structures accordingly. Plaintiffs built a retaining wall and other landscaping structures running parallel to the fence, at a cost of approximately $70,000, and maintained their side of the privacy fence by securing loose nails, pressure washing it, and coating it with water sealant as needed.

In 2011, Plaintiffs hired a surveyor to identify the property line between the Weber Property and 2409 Oakland Avenue, the opposite side of their lot from the Kroegers, because they were going to put up a fence there. The surveyor pinned the four corners of the Weber Property, including the boundary between the Weber and Kroeger Properties. Mr. Weber noticed, at that time, that the fence line and structures between their properties were off of the survey line, to his advantage in the back and to the Kroegers' favor in the front. What was historically seen as the boundary line intersected with the surveyor's property line at some point between the parties' homes such that, if adhered to, each has been encroaching on the other's property.

Upon noticing the pins and their variance from the fence, the Kroegers asked to meet with Plaintiffs. They were concerned that Mr. Fry had made a mistake, and the fence did not line up with the property line, which may create a problem if either went to sell their home. Likewise, that the potting shed they had built on their side of the fence encroached on the Weber Property. The two couples met on March 20, 2011 on Plaintiffs' patio to discuss the matter.

Mr. Weber testified that the Kroegers assured his wife and him they did not have any intention of moving the fence between their properties.

- 10 -

Further, that they walked up to the Weber Property parking pad to discuss water runoff from the alley onto the Kroeger Property, a subject the Kroegers had raised in the past. Mr. Weber did not take these claims seriously, but did continue to participate in the conversation. He testified they discussed the possibility of addressing the issue in the future, including the potential of Plaintiffs removing the parking pad and putting in pavers, when and if the Kroegers did other work at the top of their property, and that cost sharing might be appropriate. Finally, he says the conversation was general in nature and did not involve specific plans, agreements or timelines.

The Kroegers' version of the conversation is different. In addition to the discussion about the water runoff and modification to the Weber Property parking pad, Mrs. Kroeger said they were clear that when the work was to be done, the intention was to put the property line in conformance with the 2011 survey. She believed they were in agreement on that issue.

. . . .

Sometime in 2016, the Kroegers approached Mr. Weber when he was at his garage. They advised him at that time that they were going to be starting their project, and that it would be a good time to install a new paver driveway. Both parties agree the Kroegers were clear, at that time, about changing the boundary line. Mr. Weber strongly objected, and explained to the Kroegers his view of why the boundary should remain based upon Tennessee law. The Kroegers did not specify an intention to move the stone retaining wall or privacy fence, but did say the Weber Property parking pad encroached and would need to be altered. The parties left that conversation in disagreement on the issue, each firm on his or her position.

The trial court noted that the Defendants hired Mr. Brackman to perform a survey in 2016 before starting their construction project. The court found the following facts regarding the survey:

In July of 2016, as part of moving forward with their project, the Kroegers hired David Brackman, an experienced licensed surveyor, to survey the Kroeger Property. After a first visit to the Kroeger Property, Mr. Brackman returned and prepared a survey based on deeds and plats. He noted that the original plat did not show a boundary between the Weber and Kroeger Properties. Likewise there were no natural monuments described in the deeds or plat upon which to base his calculations. Mr. Brackman used the 2011 survey pins as a reference, and not other artificial

- 11 -

monuments such as the driveway or fence posts. Mr. Brackman noted that Plaintiffs' parking pad encroached over his survey line to the Kroegers' detriment, but that the retaining wall did not. He did not note the encroachment of the fence over his survey line to Plaintiffs' detriment, or that Plaintiffs' encroachment caused by the parking pad decreased from 18 inches at the alleyway to 15 inches at the stone retaining wall. Mr. Brackman testified that his survey reports were accurate. He further testified that the original plat for the Belmont-Hillsboro neighborhood does not show a boundary between the two properties because they were originally combined as one lot that was 100 feet wide.

The trial court made the following conclusions of law, among others:

> The Kroegers presented the testimony of a surveyor who opined that the disputed boundary is not consistent with the fence line. He testified that he referenced the relevant plat and deeds in performing his survey. He did not explain what about those documents provided any authority for his findings, and a review of those documents, as discussed above, is not helpful. . . .

> Although Plaintiffs did not present the testimony of a competing surveyor, the Court is not bound to adopt Mr. Brackman's testimony. The Court does not believe that Mr. Brackman established, to any degree of certainty or clarity, why he arrived at his opinion. The only markers he referred to were old survey stakes of which he did not know the age or origin. He acknowledged not having any specific deed language and/or natural monuments to go by, and did not give credence to any artificial monuments. The Court is puzzled about what he relied upon, and without more, does not accept his survey as authoritative regarding the property boundary.

> As is well set out in Tennessee case law, determination of a true boundary between parcels requires an orderly analysis of land features, some of which are given more weight than others. First, the courts look at natural objects or landmarks referenced in the deed. Here, there are no such landmarks mentioned in either of the two deeds under consideration. Moreover, the two lots were originally one, identified as Lot 167. As evidenced by language in the parties' respective deeds, at some point after the neighborhood was developed, Lot 167 was sub-divided into a "north half" and a "south half."

> The relevance of fences as indicators of property boundaries is totally dependent upon the intentions of the one who erected them. . . . This

is an unusual case in that both properties were owned by the same person, who was the seller to both, and he is the one who, in fact, constructed the fence and testified at trial. The facts Mr. Fry testified to that the Court finds relevant to this inquiry are: (i) the fence was intended to benefit both properties; (ii) Mr. Fry believed it unlikely the center of the fence post would hit directly on the boundary and he did not do a survey prior to building it, but it was his intention to erect it on the property line; and (iii) Mr. Fry considered the line where the fence was built to be the property boundary. Mr. Fry may not have surveyed the properties when he erected the fence in 2005, but the Court concludes that the privacy fence and the other fixtures on which Mr. Fry aligned the privacy fence were intended by Mr. Fry to align with a historical boundary. Moreover, other evidence at trial demonstrates that the parties intended to mark the boundary with a fence that was aligned with pre-existing structures, including (1) the north edge of Plaintiffs' parking pad, (2) the north edge of the stone retaining wall adjacent to Plaintiffs' parking pad, (3) an old chain link fence that ran along the boundary, and (4) the north edge of Plaintiffs' front walkway. All of these structures existed when Mr. Fry owned both parcels and, whether viewed individually or collectively, are compelling evidence of an agreed boundary, regardless of any "independent new lines" established by the parties' recent surveys.

The fence line does not, of course, comport with Mr. Brackman's surveys, nor does it comport with the survey Plaintiffs had done in 2011. The Court finds, however, that it is the actual boundary line based upon the facts regarding the artificial monuments marking the boundary and the importance of those monuments pursuant to Tennessee law.

(Citations omitted.)

The court also determined that the Plaintiffs were entitled to the property on their side of the fence pursuant to the doctrine of adverse possession. The court then held that the privacy fence was the parties' "jointly-owned property" that belonged to both parties. Because the Defendants removed the fence without notice to the Plaintiffs, the court ruled that the Defendants are liable to Plaintiffs for removing it without Plaintiffs' consent. As a remedy, the court ordered the Defendants "to replace the privacy fence in its precise former location with a fence of a quality no less than the privacy fence that Mr. Fry erected in 2005," with the Defendants to bear the full costs associated therewith. The court declined the Plaintiffs' request for damages and it also denied the Defendants any relief on their counterclaim.

The Defendants appeal the trial court's judgment. They contend the court erred by (1) relying on the location of the privacy fence rather than the survey to determine the

property line; (2) holding that the Plaintiffs' possession of a portion of the Defendants' property was adverse for the requisite period of time to establish adverse possession; (3) ruling that the privacy fence was jointly owned; and (4) failing to order the Plaintiffs to remove "the encroachments" from the Defendants' property. The Plaintiffs appeal the trial court's denial of their request for compensatory damages.

## II. ANALYSIS

### A. Standard of Review

In non-jury cases such as this, we review the trial court's findings of fact in accordance with Tenn. R. Civ. P. 13(d). *Blair v. Brownson*, 197 S.W.3d 681, 684 (Tenn. 2006); *Curry v. City of Hohenwald*, 223 S.W.3d 289, 291 (Tenn. Ct. App. 2007). This rule provides that an appellate court is to review a trial court's findings of fact de novo upon the record, accompanied by a presumption of correctness of the findings unless the preponderance of the evidence is to the contrary. TENN. R. APP. P. 13(d); *Blair*, 197 S.W.3d at 684; *Curry*, 223 S.W.3d at 291. We review questions of law de novo, affording the trial court's legal conclusions no presumption of correctness. *Blair*, 197 S.W.3d at 683; *Michaels v. Drinnon*, No. E2015-00009-COA-R3-CV, 2016 WL 3923904, at * 5 (Tenn. Ct. App. July 15, 2016).

This Court has addressed the standard of review in boundary dispute cases thusly:

"In resolving a boundary line dispute, it is the role of the trier of fact to evaluate all the evidence and assess the credibility of the witnesses." *Mix v. Miller*, 27 S.W.3d 508, 514 (Tenn. Ct. App. 1999) (citing *Norman v. Hoyt*, 667 S.W.2d 88, 91 (Tenn. Ct. App. 1983)). The judgment of the trial court should be affirmed, absent errors of law, unless the preponderance of the evidence is against those findings. *Phillips v. Woods*, No. E2007-00697-COA-R3-CV, 2008 WL 836161 (Tenn. Ct. App. Mar. 31, 2008). Due to the fact-intensive nature of boundary line disputes, the trial court is best suited to assess the credibility of the witnesses and its credibility determinations are binding on this court unless the evidence preponderates against them. *Id.* at *34. When the trial court makes a determination accepting one surveyor's findings over that of another, that same deference requires this court to accept the trial court's findings. *Id.*

The following rule has been adopted in Tennessee:

The construction of deed and other instruments and documents and their legal effect as to boundaries is a question of law. What boundaries the grant or deed refers to is a question of law; where

- 14 -

those boundaries are on the face of the earth is a question of fact. If, therefore, the evidence concerning the location of the true boundary line between adjacent landowners is conflicting, that issue is one of fact unless the legal construction of the deed or grant is such that the boundary is determined as a matter of law.

12 AM. JUR. 2D *Boundaries* § 121 (1997) (footnotes omitted). We therefore review the trial court's finding as to the true location of the [parties'] boundary line as a finding of fact that is entitled to the presumption of correctness. TENN. R. APP. P. 13(d). Thus, we will not disturb the trial court's judgment unless the evidence preponderates against it. *Id.*"

*Hong v. Foust*, No. E2011-00138-COA-R3-CV, 2012 WL 388448, at *5 (Tenn. Ct. App. Feb. 8, 2012); *see also Michaels*, 2016 WL 3923904, at *5-6.

B.  Property Line

When interpreting a deed, courts are to "'ascertain the grantor's intent from the words of the deed as a whole and from the surrounding circumstances.'" *Overton v. Davis*, No. E2006-01879-COA-R3-CV, 2007 WL 4207918, at *2 (Tenn. Ct. App. Nov. 29, 2007) (quoting *Griffis v. Davidson Cnty. Metro. Gov't*, 164 S.W.3d 267, 274 (Tenn. 2005)). When adjoining property owners dispute their boundary line, "'resort is to be had first to natural objects or landmarks, because of their very permanent character; next, to artificial monuments or marks, then to the boundary lines of adjacent landowners, and then to courses and distances.'" *Id.* (quoting *Thornburg v. Chase*, 606 S.W.2d 672, 675 (Tenn. Ct. App. 1980)). The *Overton* court explained that natural objects or landmarks include "objects occurring in nature, such as mountains, rivers, and streams." *Id.* "[T]rees, paths, and fords" also qualify as natural objects or landmarks. *Id.*

As set forth above, the Plaintiffs' deed describes their property as "the south half of Lot number 167 on the Map of Belmont Land Company's plan of record . . . .  Said part of Lot number 167 fronts 50 feet on the westerly side of Oakland Avenue and runs back between parallel lines 175 feet to an alley."  The Plaintiffs' deed does not specify to what the property lines are parallel.  The Defendants' deed describes their property with even less specificity; it describes the property as "the northerly half of Lot Number 167 on the Plan of Belmont Land Company's Plan of Lots called Belmont Heights."  Neither deed references any natural objects or landmarks that separate "the northerly half" from "the south half" of Lot number 167.[6]

---

[6]The original plat shows that 2405 and 2407 were owned and developed by the Belmont Land Company in 1913 and were originally part of Lot 167.

- 15 -

When the deeds do not establish the location of a property line, courts look for an original survey of the properties at issue. *See Wood v. Starko*, 197 S.W.3d 255, 259, 261-63 (Tenn. Ct. App. 2006). The record contains no evidence of a survey dating from when Lot 167 was subdivided into what is now 2405 and 2407. In the absence of an original survey, courts look for natural objects or landmarks. *See Overton*, 2007 WL 4207918, at *2. When there are no natural objects or landmarks to mark the property line, as here, courts look for artificial monuments to mark the boundary. *See id.*; *Jackson v. Bownas*, No. E2004-01893-COA-R3-CV, 2005 WL 1457752, at *7 (Tenn. Ct. App. June 21, 2005). A fence qualifies as an artificial monument if the parties intended for it to mark the boundary line. *Jackson*, 2005 WL 1457752, at *7. The *Overton* court explained:

"Whether a fence will constitute a boundary will depend on the intention of the parties and the significance they attach to the fence rather than its location or condition. The parties must intend the fence to establish the boundary and not serve as a mere barrier. A fence may be maintained between adjoining proprietors for the sake of convenience merely, and without intention of thereby fixing boundaries, in which case mere acquiescence by adjoining land owners in its existence and the occupancy of the land on either side of it do not, in themselves, constitute proof that the fence is on the accepted boundary line so as to constitute a boundary. Thus agreement to or acquiescence in the establishment of the fence, not as a line marking the boundary, but as a line for other purposes, or acquiescence in the mere existence of the fence or in the fence as a mere barrier, does not preclude the parties from claiming up to the true boundary line."

*Overton*, 2007 WL 4207918, at *7 (quoting 12 AM. JUR. 2D *Boundaries* § 90 at 490-91 (1997)). Mr. Fry testified that he placed the privacy fence where he thought the boundary line was and that he treated the line where the fence was placed as the property boundary throughout the time he lived at 2407.

The Defendants argue that their surveyor established the correct boundary line and that the trial court erred in disregarding their surveyor's report. According to the Defendants, Mr. Brackman "referred to the recorded deeds and plats, and appl[ied] those to what was found on the ground." Mr. Brackman's survey shows that the Plaintiffs' parking pad is 1.5 feet, plus or minus, north of the property line, and that the retaining wall that adjoins the parking pad, and that is perpendicular to the property line, is 1.0 foot, plus or minus, north of the property line. Mr. Brackman did not explain, however, how he determined the location of the property line. Mr. Brackman testified at the trial that Lot 167 was one hundred feet wide when it was originally laid out. He acknowledged that the original survey, as evidenced by the plat, shows no property line between 2405 and 2407 because the two properties were originally part of one parcel. Mr. Brackman further acknowledged that he did not rely on any natural monuments in

preparing his survey. He did not remember seeing the stone walkway along the north edge of the Plaintiffs' property or the privacy fence. Mr. Brackman testified that he "recall[ed] some fence posts," but he did not believe these marked the boundary line. In response to a question on cross-examination whether he "disregarded whether or not [the Plaintiffs' stone walkway, the parking pad, and the perpendicular retaining wall] marked an understood historical boundary," Mr. Brackman stated, "I just put more weight in the actual iron pins and stuff I recovered." Mr. Brackman did not explain what he meant by this statement, however, and this was the only time he (or anyone else) referred to any "iron pins."[7]

The trial court declined to adopt Mr. Brackman's testimony or survey as determinative of the boundary line because it did not believe Mr. Brackman established, "to any degree of certainty or clarity, why he arrived at his opinion." Contrary to the Kroegers' suggestion, the trial court was not bound to adopt their surveyor's testimony or report describing where the boundary line lies. This Court has explained that a trial court is not bound to adopt a survey even when there is no competing survey or contradictory expert testimony. *Dowdell v. Cotham*, No. M2006-00750-COA-R3-CV, 2007 WL 2198169, at \*8-9 (Tenn. Ct. App. July 25, 2007); *see also Michaels*, 2016 WL 3923904, at \*6 (rejecting survey where it was contradicted by other evidence); *Jackson*, 2005 WL 1457752, at \*7 (same). The trial court put more credence into Mr. Fry's testimony that he erected the privacy fence where he believed the property line was between 2405 and 2407, that he aligned it with "the pre-existing structures, including (1) the north edge of Plaintiffs' parking pad, (2) the north edge of the stone retaining wall adjacent to Plaintiffs' parking pad, (3) an old chain link fence that ran along the boundary, and (4) the north edge of Plaintiffs' front walkway," and that he treated the privacy fence as the boundary between the two properties while he lived at 2407.

As the *Hong* court wrote, "'where [property] boundaries are on the face of the earth is a question of fact.'" *Hong*, 2012 WL 388448, at \*5 (quoting 12 AM. JUR. 2D *Boundaries* § 121 (1997)). The Kroegers have failed to show that the evidence preponderates against the trial court's determination of the boundary line. Accordingly, we affirm the trial court's judgment regarding the location of the boundary line.[8]

---

[7]Mr. Brackman testified that he "saw pins" from a prior survey, but he did not testify about how the pins came to be there or what their significance to him was.

[8]Because we have determined that the boundary runs along the northern edge of the Plaintiffs' parking pad, the line where the privacy fence was erected, and the northern edge of the Plaintiffs' front walkway, it is not necessary to address whether the Plaintiffs obtained title to the disputed property by adverse possession.

B. Ownership of Privacy Fence

The Defendants next argue that the trial court erred when it held that the privacy fence was jointly owned. The trial court's findings of fact relevant to the ownership of the privacy fence include, as stated above:

> The Addendum provided that Mr. Fry would hold $5,000 of the sales proceeds in escrow until completing the agreed upon improvements and punch list items. One such improvement was a privacy fence on both sides of the Kroeger Property. The escrowed $5,000 was not intended to represent the cost of the agreed upon improvements. It was simply a number they agreed upon to incentivize Mr. Fry to finish those items.

> Mr. Fry erected the privacy fence and installed gutters at the Kroeger Property, as provided for in the Addendum, while still living next door at 2407. The fence in between those properties was intended to benefit both, and was built in a style to match the fence on the south side of 2407, in between it and 2409 Oakland Avenue.

The trial court also found that the Plaintiffs "maintained their side of the privacy fence by securing loose nails, pressure washing it, and coating it with water sealant as needed."

Without describing which evidence it was specifically relying upon, the trial court concluded:

> In the Court's view, Plaintiffs have met their burden to prove that the fence was the parties' jointly-owned property. It is undisputed that the Kroegers removed the privacy fence without notice to Plaintiffs. The Court concludes, therefore, that as the fence was jointly owned by the parties, the Kroegers are liable to Plaintiffs for removing it without Plaintiffs' consent.

We disagree with the trial court's conclusion on this issue. As the Defendants argue, they negotiated for Mr. Fry to build the privacy fence as part of their purchase of 2405. Mr. Fry acknowledged that the Defendants paid him to install the fence and that the cost of the fence was included in their purchase of 2405. The Defendants correctly point out that whether the residents of 2407 benefit from the Defendants' fence "is of no importance to [its] ownership"; no witness testified about any agreement between the parties or discussion that the fence was or would be jointly owned; and no evidence was introduced that Mr. Fry and the Defendants ever jointly owned the fence. We, therefore, reverse the trial court's judgment that the fence was jointly owned and vacate the trial court's order directing the Defendants to replace it.[9]

---

[9]Having concluded that the privacy fence marks the boundary between the parties' properties, the parties

The issue the Plaintiffs raise on appeal regarding compensatory damages is pretermitted by our holding that they have no ownership interest in the privacy fence.

### III. CONCLUSION

The judgment of the trial court is affirmed in part and reversed and vacated in part, as set forth above. This matter is remanded with costs of appeal to be assessed equally against both the appellants, Harold W. Kroeger, Mary Kay Kroeger, and The Kroeger Family Trust Dated October 26, 2018, and the appellees, Kenneth A. Weber and Shelley E. Munroe, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE

---

are free to build whatever type of fence they would like on their side of the boundary line, or they may agree to share the cost of a fence to replace the one that was removed.